702 So.2d 1187 (1997)
CLASSIC IMPORTS, INC., et al.
v.
Michael J. SINGLETON, et al.
No. 97-CA-0242.
Court of Appeal of Louisiana, Fourth Circuit.
November 12, 1997.
*1188 Darryl J. Carimi, Crystal Craddock-Posey, Carimi Law Firm, Metairie, for Plaintiff/Appellant.
Robert E. Couhig, Jr., Leslie A. Lanusse, Erin R. Danielson, Adams and Reese, New Orleans, for Defendant/Appellant.
Before SCHOTT, C.J, and MURRAY and CIACCIO, JJ.
SCHOTT, Chief Judge.
This case arose out of an automobile accident which occurred on August 14, 1986. Plaintiff, who was injured in the accident, sued the adverse driver and his insurer and her uninsured motorist insurer, National Union Fire Insurance Company of Pittsburgh, PA. The suit against the adverse driver and his insurer was settled for the policy limits. Plaintiff accepted an unconditional tender of $40,000 from National Union reserving her rights to proceed with her suit. The case against National Union was tried to a jury which returned a verdict of $122,854. The trial court credited Nation Union with $90,000 previously paid to plaintiff and rendered judgment in her favor for $32,854. The jury also found that National Union's conduct in *1189 failing to make a reasonable tender to plaintiff "was arbitrary and capricious or without probable cause" and assessed penalties against National. Both parties appealed. The principal issues are whether the trial court erred in excluding rebuttal evidence proffered by plaintiff and whether the jury's finding that National's conduct was arbitrary, capricious, or without probable cause was manifestly erroneous.
The accident occurred when an automobile driven by Michael Singleton entered an intersection against a red light and struck plaintiff's automobile broadside. According to Michael Kimble who went to the scene of the accident plaintiff was unconscious when he got there and she did not regain consciousness for fifteen minutes. An eye witness to the accident thought plaintiff was dead until she helped another person clean plaintiff's face of blood. After the accident plaintiff was taken to the hospital where she remained until August 20. She was diagnosed with multiple facial lacerations, multiple glass bodies in her face, rib fractures, myocardial contusion, diplopia or double vision secondary to blunt trauma, and imbalance due to a contusion of the labyrinth.
Dr. Swan Ward, an internist, had been plaintiff's physician since 1975 treating her for a number of ailments and injuries and examining her for certification as an automobile race driver. In June 1986, she came to him with anxiety and tension apparently because of trouble with her automobile agency, hypertension, arrhythmia, and duodenitis. He referred her to a psychologist but he could not prescribe any anti-depressant or anti-anxiety drugs because she was a certified race car driver. Following the accident he treated her at the hospital where she complained of trauma to the head, neck and thorax, substernal discomfort, and shoulder pain. She appeared to be dizzy and confused. He considered her to be primarily a neurologic and cardiac case and had specialists see her for these problems. He referred her to the neurologist because she had sustained a blow to the head rendering her unconscious and because she seemed confused. He recalled that she had been in the hospital in 1980 after a previous accident and had cardiac and neurological problems. From the present accident she also had a cervical strain.
Dr. Ward testified that plaintiff had a CAT scan, an MRI and an electroencephalogram and there was no indication of any serious brain tissue tear or permanent brain damage. However, he admitted that these tests would not reveal a diffuse axonal injury. For the rest of 1986 he continued to treat plaintiff and found signs of post concussion syndrome along with chest and shoulder pain which were gradually subsiding. In December she complained about being depressed and he referred her to Dr. Swanson, a psychologist. Dr. Ward saw her a number of times in 1987 for stomach problems. In August 1987 he did an FAA evaluation on her and certified her as a racing driver. He had no reason to believe she had sustained an organic brain injury. While continuing to treat plaintiff for general routine medical problems over the years he had no problem communicating with plaintiff. The first time he saw any significant psychological change in plaintiff was two weeks before the trial in August 1996.
Dr. William Swanson, a psychologist, saw plaintiff on referral by Dr. Ward between December 1986 and February 1989 for depression and anxiety which she related to business problems. He referred her to a psychiatrist who put her on medication which helped her. In July 1989, Dr. Swanson referred her to the Louisiana Council on Head Injuries.
Dr. Gail Brady, a psychiatrist and neurologist, saw plaintiff five times between February and September 1990. She concluded that plaintiff suffered a major depressive disorder which was related to the accident of 1986.
In August 1989 plaintiff began seeing Dr. Susan Andrews, a clinical neuropsychologist, whose primary area of expertise was the evaluation and treatment of people with brain injury. After extensive testing and counseling with plaintiff over a five year period Dr. Andrews concluded that plaintiff suffered functional brain damage as a result of the accident. She was confused and depressed. While she got some relief from Prozac, when she got off this medication she *1190 became extremely depressed and suicidal. As a result of therapy under Dr. Andrews plaintiff improved, making a "remarkably good recovery" even though she still had significant defects at the time of trial. This included difficulty in making decisions, inability to conduct business, and the failure to remember such things as her certification as a race driver by Dr. Ward. Dr. Andrews thought plaintiff's brain dysfunction was permanent and was the result of the accident.
During the course of Dr. Andrews' treatment of plaintiff she referred her to Dr. Monica Benson, a physiatrist, a specialist in medicine and rehabilitation. She first saw plaintiff in November 1989 and concluded that plaintiff had a closed head injury with cognitive impairment as a result, retrograde amnesia, a pinched nerve in her neck, diplopia and mild vertigo. She referred her to various specialists to treat these problems. An MRI run in January 1990 showed that she had two bulging discs in her cervical spine which Dr. Benson thought were caused by the accident. She saw plaintiff intermittently over the years until May 1995 and diagnosed a closed head injury, a diffuse axonal injury, and impaired higher concept reasoning. She knew plaintiff was driving an eighteen wheel tractor and trailer rig, but she advised her against this because this was hazardous. Her condition affects her coordination and analytical function. She explained that the type of brain injury she sustained would not show up on a CAT scan or an MRI.
An otolaryngologist who saw plaintiff in December 1989 on referral by Dr. Benson testified that he found that her left inner ear was abnormal causing balance problems and that she had sustained an obvious brain injury due to a concussion. When he saw her again in 1994 she was a bit improved, but she still had dizziness from her brain injury. In his opinion her inner ear problem and brain damage were caused by the accident.
Plaintiff called a number of lay witnesses who had been personal and business associates before and after the accident. These witnesses testified how plaintiff had been effective, knowledgeable, and successful as a business executive, career woman, and friend before the accident but after the accident she changed dramatically and her ability was significantly impaired.
The following summarizes the testimony of the plaintiff. She was born on May 6, 1935. After operating an auto repair shop and several rental automobile companies, in 1977 she opened a dealership under a franchise with Mazda. In the early years of the franchise she had trouble getting automobiles from Mazda and was getting threats from Mazda to cancel her franchise. This caused her to have insomnia and stress and to pass out at her home. She was hospitalized for three days and began taking Sinequan for sleep.
Her dealership was doing very well in the summer of 1986 prior to the accident. She had no memory of the accident and when she regained consciousness in the hospital she did not know why she was there. She had no memory of what happened in the hospital, but when she was discharged she was in great pain. In 1987 she got back to her automobile dealership but she found she was incapable of running it and she sold it in July 1987.
In the following year she lost the $325,000 she got from the sale of the dealership without knowing where the money went except for $50,000 she paid her attorney. (Not present counsel) She stayed in the automobile business until the summer of 1988 selling other foreign automobiles.
In the meantime, plaintiff was a race car driver since 1979 and was very successful in this endeavor. She won prizes and awards, competed in national championship meets and in April 1986 placed second in such a meet. She had also been an airplane pilot and sold her plane in 1977 when she started her Mazda dealership. She designed an automobile and two weeks before the accident she bought an expensive home. At this time she considered herself to be in excellent health. She continued racing after the accident and was gone for six weeks in July and August 1988 racing from Florida to Alaska and back. At this time her dealership was still open, but it was losing money as she later discovered.
*1191 In 1989 she sold her automobile business and started a new business called Haulin Exotics, Ltd., an automobile transportation company. In that business she bought a truck and trailer rig and started driving herself in 1990. She began seeing Dr. Andrews in 1989 and for the period of 1989-1990 she stayed home, but she became confused even when she tried to paint her house. In 1991 she entered into a contract with Volkswagen and was still transporting cars under that contract at the time of the trial. She is on the road for months at a time and she gave a detailed description of the difficulties she encounters in loading and unloading the automobiles to and from her rig.
She had plastic surgery on her face after the accident and is left with scars. She had physical therapy for her neck and back in 1986 and has suffered with the headaches for as long as four weeks duration. She has a balance problem causing her to stumble and to have trouble climbing in and out of her rig.
On cross examination she testified that she had been a patient at Tulane Medical Center in 1979. The medical records of that hospitalization disclose that she was originally thought to have a bipolar affective disorder and she was on Lithium and was in psychotherapy in 1979. Her psychiatrist later reported that her symptoms were not so indicative of a bipolar affective disorder, but instead, they indicated that her "busy, hectic life is a defense against deeper feelings and deeper involvements which she can't give up without intensive psychotherapy."
Regarding a later hospitalization at East Jefferson Hospital she stated that her problem was strictly insomnia caused by the stress exerted upon her by Mazda. She also stated that she was taking only Sinequan for the insomnia. However, the hospital records show the final diagnosis as "Depression, severe insomnia secondary to above" and Dr. Zadek, her physician, gave his personal diagnosis as "Chronic anxiety depression, Severe Insomnia Secondary to above, and Exhaustion." Furthermore this record shows that Dr. Zadek prescribed not only Sinequan but also Ativan which she was still taking in 1986. Even when confronted with pharmacy records showing this, plaintiff denied taking anything but Sinequan. She also stated that she was being weaned off the Sinequan at the time of the accident, but the pharmacy records showed otherwise. On cross examination it developed that she filed suits against Mazda and Maserati claiming economic and personal damages. She sold her Mazda franchise in July 1987 for $325,000 and she also signed a non-competition agreement with the purchaser for which she would receive $60,000 per year for five years. In May 1987 she arranged a floor plan mortgage with Hibernia Bank for 1.5 million dollars. In 1989 she borrowed $25,000 to purchase a truck and she made a loan for another $25,000 form Mercedes Benz Finance. In early 1988 she borrowed $100,000 from Metairie Bank and in August 1989 she borrowed $174,000 from First Star Company.
In January 1989 she sold her Maserati and Lotus franchises for $110,000. In addition to the suits against Mazda and Maserati, she filed a suit for rent in 1991. In 1989 she acquired a truck from Ryder which she returned for more than its depreciated value. She also had a major dispute with an insurer which placed her into a national class action filed in 1994 and she filed a suit in 1994 for Haulin Exotics against Freight Liner Corporation alleging their truck was defective and claiming one million dollars in damages including mental anguish and suffering.
Plaintiff had a history of blaming others for her troubles before and after the accident. She blamed her husband for troubles she had with Volvo and for being sued on a note years before the accident. She blamed the sheriff for tax problems she had with Jefferson Parish and a neighbor for zoning problems she had. She also placed blame on the six lawyers who represented her before her present counsel branding all of them as incompetent.
Although she claimed throughout her lengthy testimony that she could remember hardly anything and became confused with questions asked of her, she gave detailed, intelligent testimony on such subjects as floor plan mortgaging, the insurance dispute which placed her in the national class action, her problems with the Freightliner rig, and *1192 what was involved in the loading and unloading of vehicles on the rig. On cross examination she was vague about all the loans she made, but she was quite clear about all of this on redirect.
Finally, she admitted that she lied about her health to obtain a truck driver's license but she was able to provide a lengthy rationalization for her conduct claiming that her financial problems forced her to do it. She admitted, however, that when she claimed to be in desperate financial straights she was receiving $5,000 per month from the non-competition agreement she made in 1989.
National Union called Dr. Donald Adams, a neurologist, as a witness. He saw plaintiff in the hospital after the accident and found no bruises on her head and no blood in the head. Plaintiff reported no problems with memory or intellectual function. He does not believe that plaintiff suffered a significant brain injury; she had only a mild brain injury which would improve. By the time of the trial he thought plaintiff had no residual brain injury and he concluded that she was a malingerer. He reached this conclusion because she scored so low on one of the tests administered by Dr. Andrews in 1989 that it had to be a deliberate deception on her part. He stated that Dr. Andrews' tests were unreliable.
There was conflicting evidence on whether plaintiff's automobile dealership was successful before the accident compared to after the accident, whether she was successful in the automobile transport business she started after the accident, and whether the sale of her automobile dealership was profitable.
The case was submitted to the jury on special interrogatories. The jury found that the amount which would "fully and fairly compensate" plaintiff for her losses including the $90,000 she already received was:

PAST MEDICAL EXPENSES $ 29,228
FUTURE MEDICAL EXPENSES 10,727
PHYSICAL PAIN AND SUFFERING 15,727
MENTAL PAIN AND SUFFERING 18,727
LOSS OF ENJOYMENT OF LIFE 7,545
LOSS OF INCOME AND EARNING 30,909
 CAPACITY
DISABILITY 9,991
 ________
 TOTAL $122,854

By one of her assignments of error plaintiff argues that the jury verdict was somehow inconsistent as to whether the total awarded included the $90,000 previously paid to plaintiff. The interrogatory is quite clear. The jury was to arrive at the total sum plaintiff was entitled to without deduction of the $90,000. Consequently, the judgment correctly awarded her $32,854. This assignment of error has no merit. Plaintiff attempted to impeach the verdict with an affidavit of a juror stating that the jury intended to award the $122,854 in addition to the $90,000. However such an affidavit may not be considered in the absence of allegations of jury tampering. LSA-C.E. Art. 606(B); Bickham v. Airlie Corp., 468 So.2d 658, 660 (La.App. 4 Cir.1985), writ denied, 470 So.2d 120 (La.1985).
Plaintiff argues five other assignments of error, two dealing with evidentiary rulings by the trial court, two with the inadequacies of the awards for general damages and lost earnings, and one with the penalty assessed against National Union.
By her third assignment of error plaintiff argues that the trial court erred in excluding a report by Kenneth Boudreaux, an economist called by National Union. He testified that his review of the books on plaintiff's automobile dealership revealed that the net worth was static and profitability was declining at the end of 1985. He also testified that the truck transportation business which plaintiff started after the accident was producing reasonable profits by 1994-1995 and by trial time she was earning as much as she did with her automobile dealership. After being examined by both counsel and at the conclusion of redirect examination by National Union's counsel, plaintiff's counsel stated, "I forgot to have him identify this." Counsel then had Boudreaux identify an exhibit as a report he made to National Union's attorney in October 1991, five years previously, and he asked that it be received into evidence. National Union's counsel objected that the document was hearsay and the court deferred ruling on the objection until "after lunch." Plaintiff's counsel did not object to this procedure and Boudreaux was excused.
*1193 When the court considered the matter plaintiff's counsel argued that the report was completely different from Boudreaux's testimony. He argued that this report, sent in 1991, might also have a bearing on the issue of National Union's arbitrariness and capriciousness in failing to make a reasonable tender. In sustaining the objection the trial judge stated:
The court feels that it is relevant, but it is hearsay and the witness was present, and you could have examined him about it, and chose not to do so.
We find no error in the ruling of the trial court. If the purpose of its introduction was impeachment counsel failed to lay the proper foundation as required by C.E. art. 613. If introduced for any other purpose, since the witness had departed when the court made its ruling it was clearly hearsay because he could no longer be examined on its contents. In any event our review of the document which is before us by proffer convinces us that it has no probative value standing alone. It contains projections of lost income based upon averages of years previous to the accident, statements which are not clear and assumptions not necessarily supported by the evidence. For the document to make any sense to the jury Boudreaux's explanation was necessary. Because the document could provide inferences adverse to National Union in the absence of Boudreaux's testimony, fairness dictated that it be excluded under the circumstances it was offered by plaintiff.
By her second assignment of error plaintiff argues that the trial court erred in excluding the testimony of Dr. Harold Ginzburg offered by plaintiff in rebuttal. We have concluded that this assignment is meritorious. After the trial judge excluded Ginzburg's testimony it was taken on a proffer outside of the jury's presence. He directly contradicted the testimony of Dr. Adams that plaintiff's score on the test administered by Dr. Andrews proved she was a malingerer. In denying plaintiff the right to present the witness the trial judge cited Bordelon v. Drake, 578 So.2d 1174, 1178 (La.App. 5th Cir.1991).
In that case the court considered the proffered testimony as simply corroborative of what was presented previously by plaintiff. There was no new matter presented by the defense to warrant rebuttal testimony. In the instant case, while it is so that somewhere in the midst of her lengthy testimony, Dr. Andrews stated that in her opinion plaintiff was not a malingerer, the testimony of Dr. Adams went far beyond a simple opinion that plaintiff was a malingerer. He explained in detail his theory that her performance on a single test proved she was a malingerer.
Dr. Ginzburg, whose testimony was proffered, was a psychiatrist. He specifically disputed Dr. Adams' theory and stated that the test results did not support a conclusion that plaintiff was a malingerer. He also pointed to a number of tests Dr. Andrews had given plaintiff for the specific purpose of determining whether she was a malingerer all of which showed she was not.
In the Bordelon case the court observed that "we can discern no injustice resulting from the refusal of the trial court to admit this evidence, and, therefore, no abuse of discretion." At 1179. We are unable to reach the same conclusion. Coming as it did near the end of the trial and being quite powerful in its content, Dr. Adams' testimony had to have a strong impact on the jury. His conclusion that plaintiff was a malingerer because of her performance on a single test was new and it had to affect the outcome of the trial. A fair application of C.E. art. 613 to the circumstances of this case required the trial court to allow Dr. Ginzburg's testimony on this particular point.
Having concluded that the trial court erred in this regard we are left to provide the proper remedy. Plaintiff would have us make a de novo review of the record which she contends would lead to a maximum recovery of general and economic damages. She paints a picture of a woman of many talents, running a successful automobile dealership, a successful race car driver, a skilled mechanic, a leader, a person possessed of many skills and a great personality before the accident but who lost all these talents as a result of the accident and was forced to *1194 turn to the aberrational occupation of a truck driver in order to support herself.
It seems clear that the jury did not buy this picture, and while they may have been more favorably influenced toward plaintiff had they heard Dr. Ginzburg this is not to say that they would have gone all the way over to plaintiff's side. From our reading of the entire record we are convinced Dr. Ginzburg's testimony would have had an effect on the jury, but not the dramatic one plaintiff espouses.
The record discloses a number of problems with plaintiff's case. Before the accident she had psychiatric treatment and hospitalization. Even apart from Boudreaux's testimony there is evidence that the automobile dealership was not doing well before the accident. Her treating physician didn't even know she had being seeing a psychiatrist before the accident when he was her physician. He saw nothing wrong with her after the accident except mild anxiety and depression. Indeed, he gave her a certificate to race cars. She made a race between Florida and Alaska after the accident. She negotiated the sale of her automobile dealership for an arguably good price. She started another business transporting automobiles which was arguably successful. The representative of Volkswagen for whom she was transporting vehicles testified that her performance was quite satisfactory.
We have meticulously summarized plaintiff's testimony so as to demonstrate many of the problems which surfaced for the jury. Without being repetitious this testimony contains so many contradictions and curiosities that the jury must have gotten an impression of her that was quite different from the impression she paints on appeal.
When all of this is considered we are unable to agree with plaintiff that she has suffered to the extent she says or has lost earnings and income to the extent her economist Dr. Wolfson says, some 1.6 million dollars. We have concluded that an addition of $200,000 would adequately and fairly compensate plaintiff for her losses.
Finally, plaintiff argues entitlement to penalties against National Union pursuant to R.S. 22:1220 for failing to tender a reasonable amount rather than the $40,000 tendered. National Union argues that the jury committed manifest error in finding that its conduct was arbitrary, capricious, or without probable cause. We agree with the latter. An insurance company cannot be expected to guess the exact amount a jury will award. They are required to make a reasonable evaluation of a claim and attempt to settle for that amount. In the present case National Union made a fairly close guess of what the jury would award which was only $32,854 more than the $90,000 paid. Nothing in the record supports the conclusion that National Union's conduct was arbitrary, capricious or without probable cause. This was a difficult case to predict and to evaluate. Nothing shows the tender of $40,000 was made in bad faith.
Accordingly, the judgment appealed from is affirmed, but amended to increase the award in plaintiff's favor to $232,854. That part of the judgment awarding plaintiff penalties and attorneys fees is reversed and set aside.
AFFIRMED AND AMENDED; REVERSED IN PART.