Roger **BELLVILLE**, Administrator of the Estate of Sue Ellen Bellville, Deceased, and the Estate of Sue Ellen Bellville, Appellees,

and

State of Iowa ex rel. Civil Reparations Trust Fund, Intervenor–Appellee,

v.

**FARM BUREAU MUTUAL INSURANCE COMPANY,** Appellant.

No. 02–1343.

Supreme Court of Iowa.

July 29, 2005.

Rehearing Denied Aug. 29, 2005.

Thomas D. Hanson and Barry A. Russell of Hanson, Bjork & Russell, L.L.P., Des Moines, and Mark D. Sherinian, West Des Moines, for appellant.

John R. Hearn, Des Moines, and John R. Ward, Des Moines, for appellees.

Thomas J. Miller, Attorney General, Craig Kelinson, Special Assistant Attorney General, and Richard E. Mull, Assistant Attorney General, Ames, for intervenor-appellee.

Tom L. Drew of Drew Law Firm P.C., Des Moines, for amicus curiae Iowa Trial Lawyers Association.

TERNUS, Justice.

The plaintiffs, Roger Bellville and the Estate of Sue Ellen Bellville, obtained a judgment against the Bellvilles' underinsured motorist (UIM) carrier, defendant Farm Bureau Mutual Insurance Company, for extracontractual and punitive damages. The State of Iowa intervened on appeal to protect its interest in a statutory share of the punitive damage award.

The Iowa Court of Appeals reversed the judgment, ruling the district court erred in failing to grant Farm Bureau's motion for directed verdict. This court granted further review. Upon our examination of the record and consideration of the arguments of the parties, we reach the same conclusion as the court of appeals, but for slightly different reasons. Therefore, we vacate the decision of the court of appeals, reverse the district court judgment, and remand for entry of judgment in favor of Farm Bureau.

## I. Background Facts and Proceedings.

On October 9, 1999, Roger Bellville (Bellville) and his wife, Sue Ellen, were involved in a motor vehicle accident with Guy Schueler. Sue Ellen died at the scene; Bellville was unharmed.

At the time of the accident, Schueler had an automobile insurance policy with a liability limit of $50,000. Although this policy provided coverage for his liability arising out of the accident, Schueler owned few other assets. Bellville carried underinsured motorist coverage with Farm Bureau with limits of $300,000.

Early in 2000 Bellville's attorney demanded the limits of the Farm Bureau policy and also requested that Farm Bureau consent to Bellville's settlement with Schueler for the limits of Schueler's liability insurance coverage. Negotiations ensued, but Farm Bureau refused to pay Bellville's reduced demand for a $270,000 payment under the UIM coverage. In addition, Farm Bureau refused to consent to Bellville's settlement with Schueler, asserting it had no duty to do so.

On April 13, 2000, Bellville sued Farm Bureau to recover under the UIM coverage; he also alleged a tort claim for bad faith. (Although Bellville and the estate are named plaintiffs, we will refer to them jointly as Bellville or the plaintiff in the

remainder of this opinion.) Bellville's contractual claim was tried first, resulting in an award of the full $300,000 in UIM coverage. The bad faith action was then tried to a jury based on two grounds: (1) Farm Bureau's undervaluation of Bellville's UIM claim; and (2) Farm Bureau's refusal to consent to Bellville's settlement with the underinsured motorist. Farm Bureau's motion for directed verdict was denied, and the jury returned a verdict in favor of the plaintiff, finding bad faith on both grounds. The jury awarded compensatory and punitive damages. The State then intervened on behalf of the Civil Reparations Trust Fund to claim its share of the punitive damages award pursuant to Iowa Code section 668A.1(2)(b) (2001).

Farm Bureau appealed and the case was transferred to the court of appeals. The court of appeals reversed and remanded, finding the evidence was insufficient to prove Farm Bureau lacked a reasonable basis for its valuation of Bellville's claim or for refusing to consent to settlement. The court concluded, therefore, that the district court erred in failing to direct a verdict in favor of Farm Bureau.

This court granted Bellville's application for further review, as well as the Iowa Trial Lawyers Association's request to file a brief in support of the application. Although multiple issues are raised in the parties' briefs, we find it necessary to address only one: the sufficiency of the evidence to support a finding of bad faith.

## II. Governing Principles of Law.

■ A. *Standard of review.* Farm Bureau contends the district court erred in failing to grant its motion for directed verdict. A directed verdict for the defendant was required only if there was no substantial evidence to support the elements of the plaintiff's claim. *Thompson*

*v. U.S. Fid. & Guar. Co.*, 559 N.W.2d 288, 290–91 (Iowa 1997). Substantial evidence means evidence that a " 'reasonable mind would accept as adequate to reach a conclusion.' " *Id.* (citation omitted). In determining whether substantial evidence was offered, the trial court was required to view the evidence in the light most favorable to the plaintiff, "regardless of whether it was contradicted." *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 251 (Iowa 1991). The court was also obligated to draw every legitimate inference from this evidence in support of the plaintiff. *Id.* We review the trial court's ruling on a motion for directed verdict for the correction of errors of law. *See Wolbers v. Finley Hosp.*, 673 N.W.2d 728, 734 (Iowa 2003).

■ B. *Elements of bad faith claim.* To establish Farm Bureau's bad faith, the plaintiff was required to prove (1) Farm Bureau had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement, and (2) the defendant knew or had reason to know that its denial or refusal was without reasonable basis. *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149 (Iowa 1998). The first element is an objective one; the second element is subjective. *Reuter*, 469 N.W.2d at 253.

■ 1. *Objective element: lack of reasonable basis.* A reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law. *Sampson*, 582 N.W.2d at 150; *Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 96 (Iowa 1995), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000). A claim is "fairly debatable" when it is open to dispute on any logical basis. *See Morgan*, 534 N.W.2d at 96; 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 204:28,

at 204–43 (1999) (defining "debatable reason" as "an arguable reason, a reason that is open to dispute or question") [hereinafter *"Couch on Insurance 3d"*]. Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable. *See* William T. Barker & Paul E.B. Glad, *Use of Summary Judgment in Defense of Bad Faith Actions Involving First–Party Insurance*, 30 Tort & Ins. L.J. 49, 56 (1994) [hereinafter "Barker & Glad Article"].

■ The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. *Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 263 (Iowa 1991); *see Thompson*, 559 N.W.2d at 292. The focus is on the existence of a debatable issue, not on which party was correct. *See Thompson*, 559 N.W.2d at 292; *see also Myers v. Broussard*, 696 So.2d 88, 104 (La.Ct.App. 1997) (stating fact that insurer erroneously evaluated claim does not equate to arbitrary and capricious conduct); *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 286–87 (Tex.App.1992) ("The issue in the bad faith case is not whether the factfinder believes the evidence that State Farm believed when it denied the claim; the issue is whether such evidence existed.").

■ Whether a claim is fairly debatable can generally be decided as a matter of law by the court. *See Thompson*, 559 N.W.2d at 290; *Clark–Peterson Co. v. Indep. Ins. Assocs., Ltd.*, 514 N.W.2d 912, 914 (Iowa 1994); *Wetherbee v. Econ. Fire & Cas. Co.*, 508 N.W.2d 657, 662 (Iowa 1993). That is because " '[w]here an objectively reasonable basis for denial of a claim *actually exists,* the insurer cannot be held liable for bad faith as a matter of law.' " *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206 (Iowa

2003) (quoting *Morgan,* 534 N.W.2d at 97) (emphasis added). As one court has explained, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim." *Polasek,* 847 S.W.2d at 285. Thus, if it is undisputed that evidence existed creating a genuine dispute as to the negligence of an uninsured or underinsured motorist, the comparative fault of the insured, the nature and extent of the insured's injuries, or the value of the insured's damages, a court can almost always decide that the claim was fairly debatable as a matter of law. *See, e.g., Sampson,* 582 N.W.2d at 152 (holding district court properly decided bad faith claim as a matter of law where nature and extent of insured's injuries were debatable); *Cent. Life Ins. Co.,* 466 N.W.2d at 263 (holding insurer entitled to judgment as a matter of law where there was a good faith dispute on the amount of the insured's damages); *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 862 (Iowa 1991) (holding insurer entitled to directed verdict on bad faith claim where there was conflicting information as to who was at fault in underlying automobile accident); Barker & Glad Article, 30 Tort & Ins. L.J. at 57 (same). One treatise has explained the standard this way:

> [A]n insurer is innocent of bad faith as a matter of law ... if the insurer took a position in regard to the claim that reasonable minds could hold. Unless the trial court is prepared to grant a directed verdict to the insured on his claim under the policy and to hold that reasonable minds could not disagree as to the insured's entitlement to proceeds under the policy, it follows that reasonable minds could disagree about the insured's entitlement to policy proceeds. Therefore, the insurer should be entitled to a directed verdict in its favor on the in-

sured's bad faith claim unless the insured is entitled to a directed verdict in his favor on the policy claim.

Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:04, at 5–17 to 5–18 (2d ed.1997) (also discussing exceptions to this rule, none of which are implicated here) [hereinafter *"Bad Faith Actions"*]; *accord Reuter,* 469 N.W.2d at 254 (noting that existence of submissible jury question on insured's entitlement to policy benefits will generally, though not automatically, establish that the issue is fairly debatable); *see also Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,* 90 Cal. App.4th 335, 108 Cal.Rptr.2d 776, 785, 787 (2001) (stating "as long as *there is no dispute as to the underlying facts,* it is for the court, not a jury, to decide whether the insurer had 'proper cause' [to deny the insured's claim]").

2. *Subjective element: knowledge of lack of reasonable basis.* Even when the insurer lacks a reasonable basis for its denial of a claim, liability for bad faith will not attach unless the insurer knew or should have known that the basis for denying its insured's claim was unreasonable. *Sampson,* 582 N.W.2d at 150; *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 13 (Iowa 1990). An insurer's negligent or sub-par investigation or evaluation of a claim is relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis. *Reuter,* 469 N.W.2d at 254; *Bad Faith Actions* § 5:08, at 5–42 ("[A] breach of the duty to investigate constitutes a substitute for knowledge."). But "an improper investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Reuter,* 469 N.W.2d at 254–55; *accord Seastrom v. Farm Bureau Life Ins. Co.,* 601 N.W.2d 339, 347 (Iowa 1999); *Bad Faith Actions*

§ 5:08, at 5–42 (stating a negligent investigation "does not constitute bad faith by itself"). With this background, we turn now to an analysis of the plaintiff's bad faith claim.

### III. *Refusal to Pay UIM Benefits.*

A. *Statement of the issue.* Bellville's first claim of bad faith rests on Farm Bureau's allegedly "unreasonably low offer, deriving from an excessive allocation of fault and an improperly low valuation of death damages." At the outset, it is necessary to reframe the issue as stated by the plaintiff so our discussion will be consistent with the analytical framework of a bad faith claim as recognized in Iowa. Accordingly, the issue in this first-party bad faith case is not whether Farm Bureau's offer was "unreasonably low." The pertinent issue is whether there was no reasonable basis for Farm Bureau's denial of the plaintiff's demand for a $270,000 payment under the policy. Upon sufficient proof of this element, the remaining issue is whether Farm Bureau had actual or constructive knowledge that its refusal to pay had no reasonable basis. Because we conclude as a matter of law that the defendant had a reasonable basis for not paying the sum demanded by the plaintiff, we discuss only the objective element of the plaintiff's bad faith claim.

B. *Summary of evidence.* The evidence at trial showed that Farm Bureau refused to pay the plaintiff's demand because it thought the plaintiff's damages had a potential value of only $300,000. In addition, the defendant attributed 30% of the fault to Bellville, which would diminish Bellville's projected recovery from Schueler. Farm Bureau also factored in Bellville's $50,000 recovery from Schueler's liability insurer to further reduce the potential sum recoverable under the UIM coverage.

At trial, the plaintiff introduced expert testimony that the damages sustained by Roger Bellville and the estate of Sue Ellen Bellville as a result of the accident were well over $300,000. The precise figures given by these experts ranged from $600,000 to $1.5 million. As for Bellville's fault, there were varying opinions. Although all of the plaintiff's experts testified they would have assigned "little or no fault" to Bellville, three of the experts stated that a jury could have assessed as much as 10% fault to Bellville. The fourth expert opined that a jury would have assigned no more than 5% fault to Bellville.

Of course the fact that experts disagreed with Farm Bureau's valuation of its insured's claim is insufficient to establish bad faith. Similarly, testimony by these experts that Farm Bureau's valuation was, in their judgment, "unreasonable" is also inadequate to permit recovery of extracontractual damages. *See Chateau Chamberay Homeowners Ass'n*, 108 Cal.Rptr.2d at 782, 786 (holding expert's opinion that insurer's "adjustment and handling of [insured's] claim was unreasonable and [in bad faith]" did not "raise a triable issue of fact" on whether the insurer had a reasonable basis for disputing insured's claim). There must be evidence that the *basis* for Farm Bureau's valuation was unreasonable. In this respect, the plaintiff's evidence was deficient. We will address the comparative fault issue and the damages issue separately.

C. *Bellville's fault.* The record shows Farm Bureau relied on several matters revealed in its investigation of the accident to support its position that some fault would likely be assessed to Bellville. A Farm Bureau claims adjuster obtained the report of the investigating officer from the Cedar Rapids police department, which contained written summaries of statements given by Bellville and Schueler

to the officer. In addition, the adjuster interviewed Bellville and Schueler herself. Farm Bureau learned the following facts.

The accident occurred on October 9, 1999, when a motorcycle operated by Bellville collided with an automobile driven by Schueler at the intersection of Edgewood Road with O Avenue NW in Cedar Rapids, Iowa. O Avenue tees into Edgewood Road at this point from the east. The intersection, located on the crest of a hill, is controlled by traffic signals. Neither the weather nor the condition of the road surface was a factor in the accident.

At the time of the collision, Bellville was driving northbound on Edgewood Road; his wife, Sue Ellen, was a passenger. Bellville had been traveling in the outside lane, but in the block before the intersection, the traffic in front of him slowed, so he pulled into the inside lane. He was accelerating as he came up the hill towards the traffic light. As Bellville approached the intersection, he saw the traffic light change to yellow, but he did not think he could stop in time without locking up his brakes. So, he decided to proceed through the intersection.

In the same general time frame, Schueler was proceeding southbound on Edgewood Road. He pulled into the left-turn lane on Edgewood Road to turn east onto O Avenue. When the light turned green, Schueler pulled into the intersection, and then stopped in the intersection to let northbound traffic pass before making his turn. When the light changed to yellow, traffic in the northbound, outside lane slowed to stop at the intersection. Schueler, who did not see Bellville's motorcycle, then proceeded to turn left. Bellville saw Schueler's car, but was unable to stop his motorcycle. Bellville's motorcycle struck the right rear quarter panel of the Schueler vehicle just behind the rear tire. The impact occurred in the center of Bellville's lane of travel. Sue Ellen Bellville died immediately. No witnesses were identified.

The investigating officer who interviewed Bellville on the day of the accident reported the following account of the accident by Bellville:

As they were traveling in the inside lane of traffic nearing the intersection of O Avenue, Bellville said that the light controlling Edgewood Road traffic turned yellow. Roger stated he recalls his wife, Sue, saying to him, "The light's yellow. You aren't going to get stopped in time." Roger said there was a car traveling in the lane to the right of him that was able to stop for the light. However, he did not think he would be able to stop in time because in order to stop, he would have to lock up the brakes and didn't want to risk falling over, so he decided to proceed through the intersection.

He said prior to going through the intersection, he recalls looking toward a car which was stopped on O Avenue NW getting ready to turn onto Edgewood Road that was still stopped and not entering into the intersection, so he figured he was OK to proceed through the intersection.

He says when he looked back ahead of him, he then saw a car making a turn onto eastbound O Avenue, and he locked up his brakes to try and stop before hitting it, but was unsuccessful and ran into the rear quarter panel of the vehicle.

The officer also took a written statement from Schueler. Schueler told the officer that he had pulled a quarter of the way into the intersection on a green light and had stopped to let northbound traffic pass before he turned left onto O Avenue. He stated that northbound traffic approaching the intersection travels "on a down slope to a valley that Edgewood Road runs

through." He said that he "would lose sight of [northbound vehicles] momentarily because when they drive up from the bottom of the valley you cannot see them." Schueler claimed that when the light turned yellow, he "looked ahead into the northbound Edgewood Road to make sure it was clear so [he] could complete [his] turn." He "decided to make the turn onto O Avenue NW when [he] saw vehicles traveling in the northbound outside lane of traffic on Edgewood Road slowing to stop at O Avenue NW." As indicated earlier, Schueler did not see the motorcycle that hit his car until he felt the impact of the collision.

A later reconstruction of the accident by the police department put Bellville's speed at the time he applied his brakes at approximately 33 mph. The speed limit on Edgewood Road in this area was 35 mph.

Based on the information revealed by his investigation, the investigating officer concluded in his official report that a "contributing circumstance" to the accident was that Roger Bellville "Ran Traffic Signal." He concluded there were no "apparent" contributing circumstances related to Schueler's driving or his vehicle. The officer requested chemical tests of Bellville for alcohol and drugs; he did not request any of Schueler.

■ Farm Bureau relied on the officer's investigation, as well as the officer's conclusions, in evaluating the legal responsibility of Schueler and Bellville for the accident. Bellville contends the insurer was not entitled to rely on the investigating officer's report or opinions because neither would be admissible in the trial of the personal injury case. (He argues the report was hearsay and the officer's opinions were impermissible legal conclusions.) Assuming Bellville is correct concerning the admissibility of this evidence, we are not persuaded that the insurance company

should not be able to consider it. The inadmissibility of this evidence does not mean it did not have probative value that a reasonable person would rely on. *See Bad Faith Actions* § 5A:03, at 5A–11 to 5A–12 (stating insurer should be able to rely on evidence having probative value notwithstanding the fact it would be inadmissible in court); *see also Am. Mfrs. Mut. Ins. Co. v. Cupstid,* 673 F.Supp. 186, 190 n. 3 (S.D.Miss.1987) (holding insurer could consider inadmissible hearsay statement in deciding whether to pay insured's claim). Therefore, we hold the possible inadmissibility of the officer's report and conclusions did not prevent Farm Bureau from considering them in evaluating Bellville's claim for UIM benefits.

The plaintiff asserts Farm Bureau's reliance on the investigating officer's conclusion that Bellville was at fault was unwarranted for the additional reason that "it is likely a mistake." One of the plaintiff's experts speculated that the officer had the two drivers confused and had meant to indicate in his report that *Schueler* had run the traffic signal, not Bellville. Another suggested the officer simply made a mistake. No evidence was introduced, however, that the officer had not accurately stated his opinion as reflected in his report. Moreover, the fact the officer requested alcohol and drug testing of Bellville and not of Schueler supported a conclusion that the officer was, in fact, focused on Bellville as a cause of the accident and had not inadvertently or mistakenly indicated on the accident report that Bellville had run the traffic signal.

This court has held that "[a]n insurance company is not obligated to disregard the opinion of its own expert in favor of the insured's expert's opinion." *Morgan,* 534 N.W.2d at 97. Similarly, the insurer here was not obligated to disregard the opinion of the investigating officer simply be-

cause different conclusions could be drawn from the facts revealed by the officer's investigation. *See Szumigala v. Nationwide Mut. Ins. Co.*, 853 F.2d 274, 280–81 (5th Cir.1988) (holding insurer reasonably relied on investigating officer's report notwithstanding insured's contention that insurer failed to adequately consider circumstances detracting from officer's conclusion that insured was at fault in accident); *cf. Bushey v. Allstate Ins. Co.*, 164 Vt. 399, 670 A.2d 807, 810 (1995) (holding insurer could rely on independent medical witness notwithstanding evidence contrary to expert's opinion). The officer's objectively prepared report, which placed the blame for the accident on Bellville, clearly provided a reasonable basis for the insurer's conclusion that Bellville's fault could be as high as 30%. *See Szumigala*, 853 F.2d at 280–81 (holding report of deputy who investigated accident, placing blame on insured, provided insurer with a reasonable basis to deny uninsured motorist benefits).

■ The testimony of the plaintiff's experts that the company inexcusably and unreasonably failed to conduct an additional, more extensive investigation and analysis of the circumstances of the accident is simply not consistent with Iowa law. In first-party insurance situations, there is "no clearly defined duty of investigation" on an insurer; the insurer "may require the insured to present adequate proof of loss before paying the claim." *N. Iowa State Bank v. Allied Mut. Ins. Co.*, 471 N.W.2d 824, 828 (Iowa 1991). Because Farm Bureau had an objectively reasonable basis to allocate 30% fault to its insured upon receipt of the officer's report and completion of its interviews of Bellville and Schueler, it had no duty to investigate the liability issue further. *Seastrom*, 601 N.W.2d at 347; *Morgan*, 534 N.W.2d at 98; 14 *Couch on Insurance 3d* § 198:28, at

198–54 (stating generally insurer must conduct "such investigation as is required to determine the existence of coverage under the policy"); *Bad Faith Actions* § 5:8, at 57 (2d ed. Supp.2004) ("Once an insurer's investigation [has] revealed evidence sufficient to sustain a denial of the claim, the insurer has no obligation to investigate beyond that point."). If the insured contended the officer had actually meant to place responsibility for the accident on Schueler rather than Bellville, it was the insured's obligation to present adequate proof of that fact or to otherwise demonstrate that the officer's conclusions were patently unreasonable. *See Shaffer v. State Farm Mut. Auto. Ins. Co.*, 246 Ga. App. 244, 540 S.E.2d 227, 228 (2000) (stating insurer was entitled to rely on opinion of independent medical examiner "unless patently wrong based on facts timely brought to the insurer's attention").

■ Bellville's evidence at trial failed to demonstrate that he brought facts to Farm Bureau's attention that showed the officer's report was patently wrong. Rather, Bellville relied on the contention that the circumstances of the accident should have been interpreted more favorably to him. But because the relationship between an insurer and its insured is arms-length with respect to UIM coverage, Farm Bureau was not required to view the facts of the accident in a light most favorable to Bellville. *Compare N. Iowa State Bank*, 471 N.W.2d at 829 (stating insurer does not occupy a fiduciary relationship to insured when evaluating insured's claim under policy; rather, parties are in an "arms-length" relationship), *with Long v. McAllister*, 319 N.W.2d 256, 262 (Iowa 1982) (stating in meeting its *fiduciary* duty to insured, "insurer must give as much consideration to its insured's interests as it does to its own"); *see also Hutchinson v. Farm Family Cas. Ins. Co.*, 273 Conn. 33,

867 A.2d 1, 10 (2005) (stating relationship between insured and UIM insurer is adversarial, not fiduciary); *Ellwein v. Hartford Accident & Indem. Co.*, 142 Wash.2d 766, 15 P.3d 640, 647 (2001) (holding relationship between UIM insurer and insured is adversarial, and therefore, insurer does not have to give equal consideration to the insured's interest), *overruled on other grounds by Smith v. Safeco Ins. Co.*, 150 Wash.2d 478, 78 P.3d 1274, 1278 (2003). Consequently, the mere existence of evidence supporting the fault evaluation asserted by Bellville does not establish bad faith. *See Bates v. Jackson Nat'l Life Ins. Co.*, 927 F.Supp. 1015, 1022 (S.D.Tex.1996) (stating it is not enough for insured to show " 'there were other facts suggesting that the claim was valid' " (citation omitted)); *Polasek,* 847 S.W.2d at 286 (stating whether insurer had a reasonable basis for denial of claim "cannot be resolved by looking at the insured's evidence and deciding that the insurer should have believed it instead of other evidence"); 14 *Couch on Insurance 3d* § 207:4, at 207–19 to 207–20 (stating "the fact that the insured presented evidence in conflict with the insurer's evidence is an insufficient basis to assess [extracontractual damages]").

We conclude as a matter of law that the extent of Bellville's fault was fairly debatable. *See Szumigala,* 853 F.2d at 280–81 (holding extent of insured's liability for accident presented " 'a classic jury question' " (citation omitted)); *Ellwein,* 15 P.3d at 646 (affirming dismissal of bad faith claim, holding under strikingly similar facts that insurer was not in bad faith for asserting insured's comparative fault).

Therefore, it was reasonable for Farm Bureau to rely on its assessment of Bellville's comparative fault to determine its liability under the UIM coverage. Consequently, the insurer's evaluation of the respective liability of Schueler and Bellville cannot support a finding that Farm Bureau lacked a reasonable basis for its refusal to pay the plaintiff's settlement demand. We now consider the insurer's valuation of the damages recoverable by Bellville.

■ D. *Damages.* As noted earlier, Farm Bureau valued the plaintiff's personal injury claim at $300,000. The actual value of Bellville's UIM claim—Schueler's legal liability to the plaintiff—was established in the contract action between Bellville and Farm Bureau.[1] In that trial, a jury determined Bellville had sustained damages of $756,714.95. This figure was broken down as follows: (1) loss of accumulation to the estate: $100,000; (2) loss of support: $150,000; (3) loss of consortium: $500,000; and (4) interest on burial expense: $6,714.95. (The jury also found Bellville was 5% at fault.)

Our analysis of the valuation issue in the bad faith action is assisted by briefly focusing on the components of the plaintiff's damage claim: (1) loss of earnings; (2) loss of support; and (3) loss of consortium.[2] Two of the plaintiff's experts testified that the value of the plaintiff's economic damages—loss of earnings and loss of support-was between $600,000 and $1 million. But Farm Bureau was certainly not acting in bad faith in failing to assess the plaintiff's economic damages at this level. As noted, the actual value of these

---

1. Farm Bureau's policy provided that it would "pay for bodily injury an insured is *legally entitled to recover* from the owner or operator of an under-insured motor vehicle." (Emphasis added and original emphasis omitted.)

2. We ignore the nominal sum for interest on burial expense, as it appears from the record that this factor did not play a role in the parties' respective valuations of the damage claims.

damage components was only $100,000 for loss of earnings and $150,000 for loss of support. Consequently, the most that could be required of Farm Bureau was that it value the plaintiff's economic damages at $250,000; it certainly had no duty to *over* value these elements of damage. We turn now to a consideration of the overall value placed on the plaintiff's UIM claim by the parties.

Because Farm Bureau could reasonably attribute 30% fault to Bellville, it was incumbent upon the plaintiff to establish there was no reasonable basis for Farm Bureau to value Bellville's damages at less than $415,000. Only damages at that level would have warranted a UIM payment of $270,000.[3] We focus on that figure because the bad faith conduct at issue here is Farm Bureau's refusal to pay the plaintiff's demand for a $270,000 payment under the UIM coverage. Thus, the precise question that must be answered is whether there is sufficient proof that the insurer had no reasonable basis to value its insured's claim at less than $415,000.

In considering this question, we first address the plaintiff's contention that it was inappropriate for Farm Bureau to consider prior *settlements* in wrongful death cases in assessing the reasonable value of Bellville's claim against Schueler. We agree to a point. The measure of liability under the UIM coverage is the tortfeasor's "legal liability" to the insured. That legal liability is measured by what a jury would award; it is not measured by the amount for which such a case could be settled. Thus, to the extent a specific settlement is affected by factors other than the relative fault of the parties and the anticipated damages, such as limited insurance limits or a coverage question, that settlement figure would not be relevant. Whether the prior settlements upon which Farm Bureau relied were subject to this deficiency is not apparent from the record.

■ While an insurer cannot necessarily rely on prior settlements to evaluate a UIM claim, neither is an insurer obligated to pay a claim based on the range of jury verdicts rendered in other personal injury cases or based on statistical analyses done by research services, a source cited by the plaintiff's attorneys in their negotiations with Farm Bureau, as well as by the plaintiff's experts in support of their opinions. Jury verdict figures are relevant only insofar as the facts of a particular case are similar to the facts of the case being valued, and even then comparisons are of little predictive value. *Cf. Spaur v. Owens–Corning Fiberglas Corp.*, 510 N.W.2d 854, 869 (Iowa 1994) (stating comparison of verdicts is of little value in determining whether loss-of-consortium award is adequate, due to factual distinctions); *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 168 (Iowa 1984) (same); *accord Thurmon v. Sellers*, 62 S.W.3d 145, 161 (Tenn.Ct. App.2001) (stating consortium damages

---

3. The sum of $415,000 was calculated as follows. There are three known factors affecting Farm Bureau's assessment of its liability. As the plaintiff concedes, Farm Bureau would have been entitled to reduce the plaintiff's total damages by $50,000 for the payment made by Schueler's liability insurer. In addition, as we have already discussed, Farm Bureau had a reasonable basis to deduct 30% from the damages sustained by Bellville individually to account for his comparative fault. Finally, the highest value Farm Bureau could

have been expected to place on the economic damages is $250,000, meaning the balance of any total damage figure must be attributed to loss of consortium, a component subject to reduction for Bellville's comparative fault. Thus, the calculation of damages required to warrant a UIM payment of $270,000 is: $415,000 (consisting of $100,000 loss of earnings, $150,000 loss of support, and $165,000 loss of consortium) minus $94,500 (30% fault on Bellville's damages) minus $50,000 (tortfeasor payment) equals $270,500.

are impossible to generalize, so measurement of such damages must be on a case-by-case basis). Therefore, evidence introduced by the plaintiff of the possible range of jury verdicts reported in certain professional publications will not support a finding that Farm Bureau had no reasonable basis for valuing Bellville's claim at a sum less than the reported verdicts.

■■■■ Similarly, testimony that a reasonable insurer would have paid Bellville's settlement demand is likewise insufficient to support a finding of bad faith. The tort of bad faith is not established by proof of negligence. *See United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 658 (Iowa 2002) (stating negligent investigation or evaluation of claim will not, standing alone, establish bad faith); *Reuter*, 469 N.W.2d at 254 (same); *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (noting objective element of bad faith claim "makes clear the intentional nature of the tort"). Thus, it is not enough for Bellville to make a showing of unreasonableness. *See Polasek*, 847 S.W.2d at 285, 286. It was incumbent upon him to negate any reasonable basis for the insurance company's valuation of his claim.

Having determined that prior settlements and prior verdicts are generally not helpful and that proof of an erroneous, even negligent, evaluation is not enough, we are left to the valuation testimony of the experts. As one might expect, the plaintiff's experts opined that Bellville's claims had a value well over $300,000, while the defendant's experts testified that a death case of this type in Iowa would be valued at less than $300,000.

The discrepancy among the expert opinions simply illustrates the obvious: it is difficult, if not impossible, to determine with any precision how the jury will value such a claim, particularly the loss-of-consortium component. *See Williams v.*

*Hartford Cas. Ins. Co.*, 83 F.Supp.2d 567, 575 (E.D.Pa.2000) (noting different value figures put on insured's claim by insurer, insured, and arbitrator supported conclusion that value of plaintiff's claim "was not reasonably clear"); *see also Musorofiti v. Vlcek*, 65 Conn.App. 365, 783 A.2d 36, 42 (2001) (noting " 'loss of consortium is incapable of precise measurement' " (citation omitted)); *Spaur*, 510 N.W.2d at 870 ("The value of a spouse's companionship, affection, and aid is difficult to measure."); *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829, 835 (2002) (stating "[t]here is no exact fiscal formula for determination of damages recoverable for loss of society, comfort, and companionship"). As one of the plaintiff's experts observed, "there's a lot of things that go into valuing these kinds of cases and it's not a science. There's nothing exact about it, but there is judgment and experience, and it's more of an art that you develop...." In a similar vein, one court has accurately observed in discussing the valuation of a death claim, "a jury's response is not necessarily predictable." *Forcucci v. U.S. Fid. & Guar. Co.*, 11 F.3d 1, 3 (1st Cir.1993) (rejecting argument that insurer's offer to settle UIM claim was unreasonable).

We conclude as a matter of law that a bad faith claim cannot rest on Farm Bureau's failure to value Bellville's damages at a level of $415,000. *Cf. Trask v. Iowa Kemper Mut. Ins. Co.*, 248 N.W.2d 97, 101 (Iowa 1976) (affirming directed verdict for insurer in third-party bad faith case notwithstanding expert testimony that insurer undervalued claim). Certainly there may be cases in which the UIM limits are so low or the undisputed damage items so high that there would be no reasonable basis to refuse payment notwithstanding the impossibility of accurately predicting the value of the insured's damages. *See*

*Williams,* 83 F.Supp.2d at 575 ("Refusal to settle may constitute bad faith when the amount in question is clearly known by the insurer."). But this case is not one of those.

Given the amounts involved in the case before us, we are convinced the value of the plaintiff's claim was clearly subject to debate. *See Hamburger v. State Farm Mut. Auto. Ins. Co.,* 361 F.3d 875, 881 (5th Cir.2004) (granting summary judgment to insurer because there was a bona fide dispute on the value of insured's claim for pain and suffering); *Williams,* 83 F.Supp.2d at 575 (holding no bad faith as a matter of law when "[a] large component of the [insured's] claim involved pain and suffering, loss of life's pleasures and loss of consortium, all of which reasonable minds could differ in quantifying"); *see also Hopper v. Carey,* 810 N.E.2d 761, 766 (Ind.Ct. App.2004) (holding when uninsured/underinsured motorist's liability was disputed, insurer was not acting in bad faith by delaying resolution of insured's claim pending determination of motorist's liability); *Myers,* 696 So.2d at 104 (holding insurer's action was not arbitrary and capricious as a matter of law in offering less than $30,000 to insured, whose damages were ultimately determined to be over $550,000, where "medical evidence [was] extremely conflicting as to the causation and duration of [insured's] injuries"). An insurance company simply cannot be expected, at its peril, to predict the exact amount a jury will award. *See Classic Imports, Inc. v. Singleton,* 702 So.2d 1187, 1194 (La.Ct.App.1997); *cf. Ferris v. Employers Mut. Cas. Co.,* 255 Iowa 511, 521, 122 N.W.2d 263, 269 (1963) (refusing, in third-party bad faith action, to judge insurer's pre-suit evaluation of liability "by the final outcome, by a jury's decision"); *see also Galbraith v. Allied Mut. Ins. Co.,* 698 N.W.2d 325, 328 (Iowa 2005) (stating claim is fairly debatable even though verdict could be in excess of UIM limits if verdict could also have been so low as to not implicate UIM limits). For these reasons, the plaintiff's entitlement to damages from Schueler in an amount that would warrant a $270,000 payment under the UIM coverage was fairly debatable. Therefore, we hold as a matter of law that Farm Bureau cannot be held liable for bad faith in failing to meet the plaintiff's settlement demand.

IV. *Refusal to Consent to Insured's Settlement with Tortfeasor.*

■ The jury also predicated its bad faith finding on Farm Bureau's refusal to consent to Bellville's settlement with the underinsured motorist. Farm Bureau argues on appeal that its denial of consent was objectively reasonable because a UIM carrier has no duty to consent to its insured's settlement with the alleged tortfeasor. It contends alternatively that even if it is wrong in this assertion, the existence of a duty to consent was fairly debatable. The plaintiff responds that an insurer does have a duty to consent to settlement, and Farm Bureau should have known it had such a duty.

A three-judge panel of the court of appeals held that Farm Bureau had no specific duty to consent to a reasonable settlement, only a general duty of good faith. The court further concluded Bellville had "failed as a matter of law to show any underlying breach of an implied duty of good faith" relating to Farm Bureau's failure to consent.

■ A. *Existence of duty to consent.* Farm Bureau's UIM coverage included the following provision: "There is no coverage ... for any insured who, without our consent, settles with any person or organization who may be liable for bodily injury." This clause imposes a duty on the insured to obtain the insurer's consent prior to any

settlement with the tortfeasor. *Grinnell Mut. Reins. Co. v. Recker*, 561 N.W.2d 63, 68 (Iowa 1997). Our court has held that such clauses are permissible under Iowa law as a means to protect the insurer's subrogation rights against the responsible party. *Kapadia v. Preferred Risk Mut. Ins. Co.*, 418 N.W.2d 848, 851 (Iowa 1988). In recognition of this limited purpose, we have held that an insured's failure to obtain the insurer's consent to settlement will preclude payment of UIM benefits only if the insurer "proves that, absent such a breach, it could have collected from the tort-feasor." *Id.* at 852. Furthermore, the insured's entitlement to UIM benefits will be reduced only by the amount of the subrogation recovery lost by the insurance company. *Hoth v. Iowa Mut. Ins. Co.*, 577 N.W.2d 390, 393 (Iowa 1998). We have placed the burden of proving prejudice on the insurer: "The insurer must establish not only that the claim has been released but also that it was collectible and establish within a reasonable approximation the dollar amount that might be collected." *Id.*

Farm Bureau argues it had no implied duty to consent because under Iowa case law an insured can settle prior to obtaining the insurer's consent without necessarily forfeiting all benefits under the policy; recovery of benefits is reduced only by the amount otherwise collectible from the party liable. Thus, it asserts, if an insured is confident that the tortfeasor has no collectible assets, as Bellville was here, then no harm will result from the insured's settlement without consent. In response, the

plaintiff contends there is harm to the insured if the UIM carrier has no duty to consent. He claims that realistically no insured would settle with a tortfeasor without the UIM carrier's consent for fear of losing all or some portion of the UIM benefits.[4]

We think the plaintiff has the better argument. Although the consent-to-settlement clause places a duty on the insured, the obtaining of consent also bestows a benefit on the insured by facilitating the insured's settlement with the tortfeasor. Recognition of a duty to consent is also more consistent with our case law on the effect of the consent-to-settlement clause and its breach. The practical result of holding that an insurer has no good faith duty to consent is to shift to the insured the responsibility of ascertaining and evaluating the tortfeasor's ability to contribute toward payment of the insured's damages. This result is contrary to current case law under which the insurer bears the burden to establish that its subrogation rights have been harmed by a settlement to which it did not consent. If the insurer has a good faith duty to consent to settlement, it will have to make a determination up-front on the viability of its subrogation claim. If it has a reasonable basis to believe its claim has value, then it may refuse to give consent without being exposed to liability for extracontractual damages. But if the insurer has no reasonable basis to think that it can recover from the tortfeasor personally, then it must give consent to its insured's settlement with

---

4. The chilling effect on settlement of the UIM insurer's refusal of consent is now even more likely in light of our recent decision in *Allied Mutual Insurance Co. v. Heiken*, 675 N.W.2d 820 (Iowa 2004). We held in *Heiken* that a tortfeasor who knows of an insurer's subrogation rights remains liable to the insurer notwithstanding a release from the injured insured if the tortfeasor knows the insurer has not consented to the settlement. 675 N.W.2d at 830. A tortfeasor with knowledge of an insurer's subrogation interest, even when contingent, may be disinclined to settle with the injured party, knowing that the subrogation claim of the nonconsenting insurer remains viable.

and release of the tortfeasor.[5] For these reasons, we hold the consent-to-settlement clause not only imposes an express duty on the insured to obtain the insurer's consent to settlement but also imposes an implied reciprocal duty on the insurer to consent unless it has a reasonable basis for refusing to do so. *Cf. Brunet v. Am. Ins. Co.,* 660 F.Supp. 843, 846 (D.Vt.1987) (holding duty of good faith requires insurer to consent to insured's settlement with tortfeasor "if the settlement is within the best interests of both insurer and insured"); *Pickering v. Am. Employers Ins. Co.,* 109 R.I. 143, 282 A.2d 584, 591 (1971) (stating consent-to-settlement clause "carries with it an implied promise by the insurer that its consent will not be arbitrarily or unreasonably withheld").

■ Of course, the mere fact that Farm Bureau was wrong in concluding it had no duty to consent to settlement does not mean it was in bad faith. *See Bad Faith Actions* § 5:07, at 5–26; *cf. Kohlstedt v. Farm Bureau Mut. Ins. Co.,* 258 Iowa 337, 347, 139 N.W.2d 184, 190 (1965) ("A mere mistake in judgment is not enough to show bad faith."). Nor does the fact that Farm Bureau took a position on this issue that was contrary to its insured necessarily subject it to liability. An insurer's duty of good faith does not require it to take a position favorable to its insured on an unsettled question of law. *See Bad Faith Actions* § 5:07, at 5–26 to 5–30. The determinative question is whether its position was reasonable, and that matter turns on whether the existence of a good

faith duty to consent was fairly debatable. We now address that issue.

■ B. *Whether existence of duty to consent was fairly debatable.* There are several factors that indicate Farm Bureau had a reasonable basis to assert it had no duty to consent to its insured's settlement. First, whether a UIM insurer has a good faith duty to consent had not been decided by an Iowa appellate court. *See Colonial Penn Ins. Co. v. First Ins. Co. of Haw., Ltd.,* 71 Haw. 42, 780 P.2d 1112, 1114 (1989) (affirming summary judgment for insurer on bad faith claim when coverage issue "was an open question of law"); *CUNA Mut. Ins. Soc'y v. Norman,* 237 Va. 33, 375 S.E.2d 724, 727 (1989) (finding no bad faith, in part, based on fact that "issue was a matter of first impression in this jurisdiction"); 14 *Couch on Insurance 3d* § 207:4, at 207–17 (stating disputed point of law provides reasonable basis for denial of policy claim where issue is one of first impression); Barker & Glad Article, 30 Tort & Ins. L.J. at 86 ("Many courts have found insurer legal positions reasonable, even in the absence of clear supporting authority, because the issue was an open one or one of first impression in the controlling jurisdiction."). Moreover, whether such a duty should be implied is a question upon which reasonable minds could differ, as evidenced by the court of appeals' ruling in this case. *See* Barker & Glad Article, 30 Tort & Ins. L.J. at 83 (stating "the most reliable method of establishing that the insurer's legal position is reasonable is to show that some judge in the relevant jurisdiction has accepted it as correct").

**5.** The other option available to an insurer who is reluctant to consent to its insured's settlement with the tortfeasor is to tender the amount of the proposed settlement to the insured and substitute its payment for that of the tortfeasor, thereby becoming fully subrogated to any recovery from the tortfeasor. *See Recker,* 561 N.W.2d at 70. Although we are asked to make this option mandatory, we decline to do so. There is simply no provision in the policy from which such an obligation can be implied. If such an extracontractual duty is to be imposed upon insurers, the legislature is most suited to make that policy decision, as well as to specify the framework for such a procedure.

Thus, we conclude the question of whether an insurer had a good faith duty to consent was fairly debatable as a matter of law.

C. *Summary.* A UIM insurer has a good faith duty to consent to its insured's settlement with the tortfeasor when there is no reasonable basis to believe the tortfeasor has any assets or other ability to contribute toward satisfaction of the insurer's subrogation rights. For purposes of the present case, however, this duty was not so evident that Farm Bureau could not fairly debate whether such a duty existed. Therefore, Farm Bureau had a reasonable basis to refuse to consent to Bellville's proposed settlement with Schueler. Consequently, the defendant's refusal to consent cannot support the jury's verdict finding the defendant in bad faith.

V. *Conclusion and Disposition.*

The extent of the tortfeasor's liability for Bellville's damages and the value of those damages were fairly debatable as a matter of law. Therefore, Farm Bureau's refusal to pay the plaintiff's settlement demand for UIM benefits was not made in bad faith. In addition, although Farm Bureau was wrong in concluding an insurer has no good faith duty to consent to its insured's settlement with the tortfeasor, this issue was fairly debatable. Consequently, Farm Bureau was not in bad faith for refusing to give consent to Bellville's proposed settlement with Schueler.

Because the plaintiff's claims of bad faith have no merit as a matter of law, the trial court erred in failing to direct a verdict in favor of the defendant. As this conclusion requires reversal of the judgment in favor of the plaintiff for both compensatory and punitive damages, we need not address the evidentiary issues raised by Farm Bureau or its challenge to the punitive damage award. Accordingly, we reverse the judgment in favor of the plaintiff and remand for entry of judgment for the defendant.

**DECISION OF COURT OF APPEALS VACATED. DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except LARSON, J., who takes no part.