Robert **MORSE** and Linda Morse, Plaintiffs,

v.

**STATE FARM FIRE & CASUALTY COMPANY, Defendant.**

No. 4:09–cv–00136–JEG.

United States District Court, S.D. Iowa, Central Division.

June 8, 2010.

Erin M. Carr, Carr and Wright, Des Moines, IA, for Plaintiffs.

Rex A. Rezac, David J. Stubstad, Fraser Stryker PC LLO, Omaha, NE, for Defendant.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on a Motion for Partial Summary Judgment brought by Defendant State Farm Fire & Casualty Company (State Farm), which Plaintiffs Robert Morse (Robert) and Linda Morse (Linda) (collectively, the Morses) resist. The Court held a hearing on the motion on May 18, 2010. State Farm was represented by attorney Rex A. Rezac. The Morses were represented by attorney Erin M. Carr. The matter is now fully submitted and ready for disposition.

## I.  BACKGROUND [1]

The Morses lived in a single family residence in Guthrie Center, Iowa, (the Guth-

---

1. The facts of this case are either not in dispute or are viewed in the light most favorable to the Morses, the nonmoving party. *See Eastling v. BP Prods. N. Am., Inc.,* 578 F.3d 831, 836 (8th Cir.2009). Although the Court views the evidence in the light most favorable to the Morses, "it is not required to 'accept unreasonable inferences or sheer speculation as fact.' " *Reed v. City of St. Charles, Mo.,* 561

rie Center house) with their nine-year old grandson, B.H., until the house was destroyed by fire on April 28, 2008. On the morning of the fire, the Morses and B.H. left the Guthrie Center house between 4:20 and 4:30 a.m. and drove to Des Moines, Iowa, where Linda was scheduled to work at 6:00 a.m. and where B.H. was scheduled to undergo a tonsillectomy. At 4:52 a.m., Grant Sheeder, one of the Morses' neighbors, called 911 and reported that the Guthrie Center house was on fire. The Guthrie Center Fire Department responded to the call at 5:07 a.m. At 5:35 a.m., while the Morses were still driving from the Guthrie Center house to Des Moines, Chris Sheeder, another of the Morses' neighbors, called Linda and informed her that the Guthrie Center house was on fire. The Morses continued driving to Des Moines, believing that it was important to deliver B.H. to B.H.'s mother so that he would not miss his scheduled surgery. The Morses delivered B.H. to B.H.'s mother in Des Moines, and Linda notified her employer that she would not be working that day. The Morses then returned to the Guthrie Center house and found that it had been destroyed.

State Farm insured the Guthrie Center house under farm/ranch policy number 95–B5–6677–4 (the policy). The policy covered the Guthrie Center house and the Morses' personal property therein for "accidental direct physical loss," including loss caused by fire. Def.'s App. 99. The policy stated that "[i]f you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void and we will not pay you or any other insured for this loss" (intentional acts clause). Def.'s App. 102. The policy further provided that if the insured "intentionally concealed or misrepresented any material fact or circumstance relating to the insurance, whether before or after a loss," the policy was void (concealment or misrepresentation clause). Def.'s App. 103. The Morses reported the fire to State Farm on or about April 28, 2008, and at the time of the claim, State Farm provided the Morses with a $2000 cash advance and with temporary living arrangements at a Heartland Inn in Des Moines, Iowa, at a total cost of $12,061.28 to State Farm.

Later on the day of the fire, and apparently without the benefit of any detailed cause and origin investigation, the Guthrie Center Fire Department noted on an Iowa Incident Report that the form of heat ignition that started the fire was electrical. State Farm originally assigned the Morses' claim to Fire Company Field Claim Representative William Meyer (Meyer). However, soon after State Farm began its investigation State Farm identified what it felt were indicators of fraud and therefore reassigned the Morses' claim to Stacy Niemann (Niemann) of State Farm's Special Investigations Unit. Niemann informed the Morses that their claim had been referred to him for a follow-up investigation and noted, "[a]n investigation into the circumstances of this fire needs to be completed before a decision can be reached concerning the merits of your claim." Def.'s App. 129.

State Farm retained Independent Forensic Investigations Corporation (IFIC) to conduct a forensic investigation of the fire scene. On May 1, 2008, IFIC fire investigator George Howe (Howe) entered the Guthrie Center house, with Robert's permission, and began an investigation to determine the cause of the fire. Following

F.3d 788, 791 (8th Cir.2009) (quoting *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir.2004)).

his inspection, Howe remarked that "[t]he front door on the south side of the dwelling had been forced open, reportedly by the fire department," and that "the interior of the dwelling sustained smoke and heat damage throughout." Def.'s App. 86. Howe noted, "[t]he fire does appear to have originated in the bath/laundry room." Def.'s App. 87. The bath/laundry room was a multi-function room that contained "clothing, at least three portable space heaters and a rug doctor carpet cleaning machine. Also in this room was located the furnace, washer and dryer, bathtub, toilet, sink and a ceiling mounted bath fan/light combination." Def.'s App. 91. Howe concluded that the electric space heaters were not plugged in at the time of the fire. Howe found "[t]here was only minor heat damage to the inside of the furnace and no indication the furnace was involved in the cause of the fire," and that while "[t]here was no significant fire damage to the back of the [washer and dryer] and no indication either appliance was involved in the cause of the fire," the "most intense fire damage occurred to the front of the washer and dryer." Def.'s App. 87.

The Morses suggested that the furnace, which was installed in November 2007 at a cost of $2000.00, was likely the cause of the fire. Robert stated that when the furnace was in use, it often smelled like it was getting hot, and the pipe that transported the furnace's exhaust air would be hot to the touch. State Farm's investigator did not test run the furnace; but, on May 12, 2008, Howe returned to the Guthrie Center house with IFIC electrical engineer Todd Hartzler (Hartzler) to investigate the furnace. Following an inspection of the furnace, Hartzler concluded,

> [t]he power circuit for the furnace was traced out and wired with a 12 gauge yellow jacketed Romex cable. This cable had been installed in the circuit breaker panel but only connected to the ground and neutral buses. The black,

or hot wire of this cable, was not connected to a circuit breaker. The insulation on the black wire had never been stripped in preparation for a connection to a breaker. An unused 20 amp circuit breaker was found inside the bottom of the electrical panel. The breaker was covered with cobwebs and it was clear that it had never been utilized within the electrical panel. It is believed that this circuit breaker was likely intended to provide power to the furnace circuit.

Def.'s App. 92. Hartzler concluded that "the furnace was not connected to a source of electrical energy and could not operate." *Id.* Hartzler also ruled out the washer and dryer, space heaters, the bath fan and associated wiring, the light fixture installed over the sink, electrical outlets throughout the room, the carpet cleaner, and a corded trouble light as possible causes for the fire and concluded that "the electrical wiring and appliances played no role in the cause of the fire." *Id.*

Howe also removed flooring samples from the bath/laundry room to be tested for the presence of ignitable liquids. Armstrong Forensic Laboratory, Inc. (Armstrong) examined the samples provided by Howe and determined that the samples did not contain identifiable ignitable liquids. However, Armstrong cautioned that the "[f]ailure to identify an ignitable liquid in any sample of fire debris should not be interpreted to mean that an ignitable liquid could not have been present. It means only that none could be recovered from this debris." Pl.'s App. 125.

In a report dated June 5, 2008, Howe informed Niemann that "[t]he electrical system, furnace, and all electrical appliances in the bath/laundry room have been ruled out as potential fire causes by an electrical engineer and, at this time, we have been unable to identify any likely or logical accidental cause for this fire."

Def.'s App. 89. Howe concluded that "[b]ased on the information available at this point in the investigation it appears, in my opinion, that this fire was most probably set intentionally." *Id.*

On August 6, 2008, Niemann interviewed the Morses' neighbor, Kerry Sheeder (Kerry), and Kerry's father, Richard Sheeder (Richard). Kerry and Richard stated that on April 27, 2008, the day before the fire, they each saw Linda and B.H. carry boxes out of the Guthrie Center house and load the boxes into the Morses' pickup truck. Kerry, who was calving cows in a pasture southeast of the Guthrie Center house on April 27, said that the Morses' truck "was pretty darn full almost . . . almost full [with boxes]." Def.'s App. 35. Richard similarly testified, "[w]hen I went up the hill I looked around through the back of the cab and it looked like that [truck] was jammed quite full almost back to back." Def.'s App. 33. Linda said that she only loaded the truck with three duffel bags, which contained the Morses' clothes for their planned week in Des Moines.

During the course of the investigation, State Farm also interviewed the Morses on multiple occasions. With regard to the events at the Guthrie Center house on the morning of April 28, 2008, Linda stated that the furnace was running when she used the bathroom that morning, that no space heaters had been turned on, and that nothing seemed out of the ordinary. Robert agreed that nothing was unusual that morning. Linda said that she was the last person to exit the house and that she locked the door behind her. Linda also said that on the day of the fire the Morses possessed the only two known sets of keys to the house.

Niemann learned during the investigation that the Morses often stayed with their children, who lived much closer to Des Moines than the Morses, because Linda worked in Des Moines. In 2008, the Morses discussed selling the Guthrie Center house and moving closer to Des Moines in order to save money on gasoline, but ultimately decided not to sell the Guthrie Center house. Robert explained, "[w]e just talked about [selling it] but I'll say down deep I would have probably kept it." Pl.'s App. 21.

Robert steadfastly denied that the Morses knew of anyone that was upset with them or wanted to harm them. Robert testified, "I'm a man that's got very few enemies. I don't think I even got any. I'm usually running—riding in the saddle by myself, stay the hell away [from] as many people as I can. Way I look at it[,] I don't bother nobody." Def.'s App. 46. When asked again if there was anyone who would want to burn down the Guthrie Center house, Robert replied, "[t]here ain't nobody down there'd do that." *Id.*

State Farm learned that the Morses' prior home, which was located in Des Moines, Iowa, (the Des Moines house) was destroyed by fire on November 12, 2000. While Robert Morse said he believed that "the furnace started that fire," Def.'s App. 42, Linda Morse said she believed that the fire was started by "the plug-in for the stove to run the timer and the clock, and everything, that it started right there in the kitchen." Def.'s App. 63. The Morses received $50,000 in insurance proceeds from the Des Moines house fire and used those proceeds to purchase the Guthrie Center house.

Although the Morses contend that their finances on April 28, 2008, were not materially different than they had been in the past, State Farm discovered evidence that led it to conclude that the Morses had a financial incentive to cause the loss of the Guthrie Center house. For instance, State Farm learned that the Morses defaulted on tax payments for the Des Moines house and that an individual named Brian Kay (Kay) purchased the Des Moines house at

a tax sale. The Morses and Kay entered into a contract under which the Morses agreed to make payments to Kay in exchange for retaining possession of the Des Moines house. The Morses' contract with Kay required the Morses to insure the Des Moines house against fire loss and provided that any proceeds from a loss of the Des Moines house were payable to Kay in proportion to Kay's interest in the house at the time of the loss. However, when the Des Moines house was destroyed by fire in 2000, the Morses received $50,000 from the insurance policy and, rather than compensate Kay, purchased the Guthrie Center house. Kay sued the Morses and received a default judgment in the amount of $18,578.82 against the Morses.

The Morses filed for bankruptcy in 2002, in part, due to the debt the Morses owed to Kay. However, the debt the Morses owed to Kay was not discharged in bankruptcy, and therefore the Morses took out a $50,000 mortgage on the Guthrie Center house in 2004 in order to pay Kay and other outstanding debts. Despite filing for bankruptcy in 2002 and taking a $50,000 mortgage on the Guthrie Center house in 2004, the Morses still had several small claims judgments against them and numerous accounts in collection at the time of the Guthrie Center house fire in 2008. In addition, the Morses did not have a retirement or an investment account, their only checking account contained approximately $300 at the time of the fire, Robert had been unemployed since 1974 and received $1300 per month in Social Security benefits, and Linda earned only $12.50 per hour as a leather upholsterer.

State Farm also learned that the Guthrie Center house was in need of repairs at the time of the 2008 fire. The Morses began to replace the roof of the Guthrie Center house in the summer of 2007 but had only completed half the project when the fire occurred in April 2008. The siding was in need of repair. The Morses had to run electric space heaters in the bathroom in order to keep the water pipes from freezing, and plaster was falling off the walls inside the house. The Morses attempted to refinance their mortgage in 2006 in order to pay for remodeling projects, but the bank denied their application. Finally, on May 6, 2008, Richard Sheeder reported to the Guthrie County Environmental Health Department (the County) that the Morses had not fed their horses and other livestock for over thirty days.[2] The County investigated the report and determined that one of the Morses' animals was extremely emaciated and that others were very thin. Robert, believing that State Farm had called in the complaint in an attempt to harass the Morses, moved the animals to Warren County, Iowa.

In a loss claim committee report dated December 16, 2008, State Farm concluded that the Morses' claim should be denied because "[e]vidence supports involvement by an insured with the cause of this [fire] based on credible information showing opportunity and strong financial motive. As a result of this evidence, the zone committee finds the reported fire to insured dwelling was not cause[d] by accident as required under Section 1 of the policy." Def.'s App. 77. State Farm further concluded that the Morses were not entitled to benefits because "Robert and Linda Morse have engaged in [an] extensive pattern of concealment and misrepresenting facts in the presentation of their claim. As a result they have violated the Concealment or Fraud provision of this policy."[3]

---

2. The Morses assert the report was regarding an elderly mule.

3. State Farm initially alleged that the Morses' violation of the concealment or misrepresentation clause of the policy was a valid basis

*Id.* State Farm requested that Howe review all of the evidence in the case one more time, and on January 8, 2009, Howe again concluded that "to a reasonable degree of fire science certainty, this fire originated in the bath/laundry room ... and was incendiary in nature." Def.'s App. 95.

In a letter dated January 14, 2009, State Farm notified the Morses that State Farm had concluded its investigation and that "[b]ased upon the proof of loss, the investigation to date, your conduct, and your Examinations Under Oath, State Farm has determined that no payment is owed under the terms of the policy as a result of this fire." Def.'s App. 167. State Farm explained that "[i]t is the conclusion of State Farm that the fire damage to [the Guthrie Center house] is not the result of an accidental loss as required by the policy, and that you caused or procured the burning of [the Guthrie Center house] for the purpose of obtaining insurance benefits," and that "[t]he policy is void as of the date of loss." Def.'s App. 169.

On March 19, 2009, the Morses filed this lawsuit in Iowa District Court, alleging breach of contract and seeking to recover their losses under the terms of the policy (Count I) and bad faith denial of their coverage claim (Count II). State Farm timely removed the action to federal court pursuant to 28 U.S.C. §§ 1332 and 1441. State Farm then answered the complaint, denying that State Farm was obligated to make any payments under the Morses' policy or that it engaged in bad faith in denying the Morses' claim. On March 15, 2010, State Farm filed this Motion for Partial Summary Judgment on the Morses' bad faith denial of coverage claim.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). State Farm bears the burden of establishing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then, "[i]n order to create an issue for trial the nonmoving party must produce sufficient evidence to support a verdict in his favor based on more than 'speculation, conjecture, or fantasy.' " *Doe v. Dep't of Vet. Affairs*, 519 F.3d 456, 460 (8th Cir.2008) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir.2003)).

In analyzing a motion for summary judgment, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. Federal Rule of Civil Procedure 56(c) requires summary judgment to be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

---

for denying the Morses' claim. At the motion hearing, counsel for State Farm conceded that fact questions likely surrounded the issue of whether State Farm relied on the Morses'

alleged misrepresentation to State Farm's detriment and therefore withdraws this theory as a basis for denying the Morses' claim at the summary judgment stage.

proof at trial." *Celotex,* 477 U.S. at 317, 106 S.Ct. 2548; *see also Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations and quotation marks omitted)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

## B. Bad Faith Claim

This diversity case is governed by Iowa law, which "recognizes a common-law cause of action against an insurer for bad-faith denial or delay of insurance benefits." *Rodda v. Vermeer Mfg.,* 734 N.W.2d 480, 483 (Iowa 2007) (citing *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790, 794 (Iowa 1988) (adopting the bad faith cause of action)). In order to establish State Farm's bad faith, the Morses must show that "(1) [State Farm] had no reasonable basis for denying the [Morse]'s claim or for refusing to consent to settlement, and (2) [State Farm] knew or had reason to know that its denial or refusal was without reasonable basis." *Bellville v. Farm Bureau Mut. Ins. Co.,* 702 N.W.2d 468, 473 (Iowa 2005). The first element is objective while the second is subjective. *Id.*

■ "A reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law." *Id.* Iowa courts have explained that a claim is fairly debatable where "it is open to dispute on any logical basis," or "[s]tated another way, if reasonable minds can differ on the coverage-determining facts or law." *Id.; see also Galbraith v. Allied Mut. Ins. Co.,* 698 N.W.2d 325, 328

(Iowa 2005) ("[T]o succeed on such motions the insurer must demonstrate that a reasonable trier of fact could not determine that the insurer lacked a reasonable basis for denying or for delaying payment of the claim."); *Gardner v. Hartford Ins. Accident & Indem. Co.,* 659 N.W.2d 198, 206 (Iowa 2003) ("Where an objectively reasonable basis for denial of claim actually exists, the insurer cannot be held liable for bad faith as a matter of law." (quoting *Morgan v. Am. Family Mut. Ins. Co.,* 534 N.W.2d 92, 97 (Iowa 1995))).

■ "The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim." *Bellville,* 702 N.W.2d at 473. This is because the focus of the Court's inquiry "is on the existence of a debatable issue, not on which party was correct." *Id.* As such, the Court does not "weigh the conflicting evidence that was before the insurer; [it] decide[s] *whether evidence existed* to justify denial of the claim." *Id.* at 474. "Whether a claim is fairly debatable can generally be decided as a matter of law by the court." *Id.* at 473. If the Court finds that State Farm did not have a reasonable basis for denying the Morses' claim so as to satisfy the first element of the bad faith tort, then the Court must consider the subjective element, that is whether State Farm knew or should have known that its reason for denying the Morses' claim was unreasonable. *See Rodda,* 734 N.W.2d at 483.

### 1. Objective Element

■ To determine whether State Farm had a reasonable basis for denying the Morses' claim, the Morses argue that the Court should apply the analysis found in *Toney v. Black Hawk Mutual Insurance Ass'n,* 584 N.W.2d 570, 572 (Iowa Ct.App. 1998). The *Toney* court adopted a five-factor test to determine whether circum-

stantial evidence beyond motive implicated the insured with arson: "(1) whether the property was overinsured; (2) the incendiary nature of the fire; (3) the insured's access to the premises; (4) evidence of breaking and entering or burglary; [and] (5) other unexplained circumstances implicating the insured." *Toney,* 584 N.W.2d at 572 (citing *Natalini v. Nw. Fire & Marine Ins. Co.,* 219 Iowa 806, 259 N.W. 577, 579–80 (1935)).

In *Toney,* the issue before the court was whether an insurance company, Black Hawk, breached its contract with the insureds, the Toneys, by refusing to pay the Toneys' fire insurance claim on the basis that Black Hawk had determined that the Toneys intentionally set fire to their own house. See *id.* at 571–72. Similarly, the issue before the court in *St. Paul Fire & Marine Insurance Co. v. Salvador Beauty College, Inc.,* 731 F.Supp. 348, 349 (S.D.Iowa 1990), was whether sufficient evidence existed to uphold the jury's finding that the insured intentionally started the fire at issue in the case. Thus, neither the *Toney* court nor the *St. Paul Fire* court, which also utilized the factors identified in *Natalini,* was tasked with determining whether an insurance company acted in bad faith in denying a claim; rather, those courts considered whether sufficient evidence existed to implicate claimant insureds in the arson of the insureds' own properties such that the insurance companies were not responsible for paying the insureds' fire claims under the terms of the insurance policies at issue.

The parties cited only one case, *Joens v. United Fire & Casualty Co.,* Nos. 0–772, 99–1415, 2001 WL 58409, at *3 (Iowa Ct. App. Jan. 24, 2001) (unpublished), in which an Iowa court referenced the *Toney* factors in the process of analyzing whether the circumstances involving a breach of contract claim for failure to cover a fire loss amounted to an intentional tort to support a claim for punitive damages.[4] At first *Joens* may appear to be an outlier. Published court decisions applying Iowa law have only utilized the *Toney* factors in order to determine whether an insurance company breached an insurance contract in denying an insured's policy claim. See *St. Paul Fire,* 731 F.Supp. at 350–52; *Toney,* 584 N.W.2d at 572. As the Morses' counsel conceded at the motion hearing, the Court need not try the breach of contract claim to determine whether State Farm is entitled to summary judgment on the Morses' bad faith claim. An application of the *Toney* factors at this stage of the proceedings would effectively conflate the breach of contract and bad faith inquiries and unnecessarily meld the two analyses into one. This Court does not read *Joens* as standing for such a principle. Rather, the *Joens* court simply appears to have used the *Toney* factors as a vehicle to test the adequacy of the information available to United Fire & Casualty Company, and to thereby determine if that defendant had acted in a fashion to support a claim that the breach of that insurance contract had been a willful and malicious act supporting a claim for punitive damages. Because the question of whether the Morses intentionally set fire to their own house is not before the Court on this motion for partial summary judgment, and assuming *arguendo* that *Joens* could be read in so elastic a fashion, this Court would decline to follow *Joens,* an unpublished Iowa Court of Appeals opinion. *See* Iowa R.App. P. 6.904(2)(c) (stating that "[a]n unpublished opinion or decision of a court or agency may be cited in a brief if the opinion or decision can be readily accessed

---

**4.** *Joens* was not specifically plead as a bad faith claim. Because of the similarity of willful and malicious breach of an insurance contract with a bad faith denial of coverage claim, that court may have found itself faced with a task easier to decide than to explain.

electronically. Unpublished opinions or decisions shall not constitute controlling legal authority").

The Court need only determine whether State Farm's application of the intentional acts clause was fairly debatable, that is, whether State Farm's coverage decision was "open to dispute on any logical basis." *Bellville*, 702 N.W.2d at 473. State Farm's investigatory findings include (1) that IFIC concluded that the fire was incendiary;[5] (2) that the Morses were seen moving personal possessions out of their house the day before the fire; (3) that the Morses were under financial strain and that the Guthrie Center house was in need of repair; (4) that the Guthrie Center house showed no signs of forced entry or burglary and that the Morses were the last individuals inside the Guthrie Center house and had the only keys to the house; and (5) that the Morses' Des Moines house was also destroyed by fire in 2000, resulting in the payment of a claim. The Morses rebut these findings, arguing that there is no credible evidence that they violated the terms and conditions of their insurance policy, and therefore the question as to the applicability of the intentional acts clause is not fairly debatable.

State Farm retained IFIC, which determined after an inspection of the Guthrie Center house that "to a reasonable degree of fire science certainty, this fire originated in the bath/ laundry room ... and was incendiary in nature." Def.'s App. 95. The Morses argue that the investigation was not credible and suffered from a leap of logic in that IFIC concluded that because it had ruled out all possible accidental causes for the fire, the fire must have been incendiary in nature. However, the

Morses offered no evidence that refuted the procedures or investigative techniques of IFIC so as to show that State Farm impermissibly relied on IFIC's investigative results. Even if the Court assumes *arguendo* that the Morses did not intentionally cause the loss of the Guthrie Center house, the analysis would remain the same because "[t]he fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct." *Bellville*, 702 N.W.2d at 473.

■ The Morses also argue that IFIC's conclusion that the fire was incendiary was erroneous because there was no evidence of accelerants and because no one saw the Morses set fire to the Guthrie Center house. However, under Iowa law,

> [i]n a first-party bad faith claim, an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim. In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim.

*Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999) (internal citations and quotation marks omitted). Even if the Morses had presented evidence that the investigation was not as thorough as it should have been, which they did not, an imperfect investigation by IFIC would not destroy State Farm's reasonable reliance on IFIC's findings. *Id.; see also Merriam v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 572 F.3d 579, 585 (8th Cir.2009) (applying Iowa law); *Bell-*

---

**5.** In the absence of record evidence affirmatively evidencing an intentionally set fire, the investigation proceeded through a process of elimination of any other source of ignition. The Court recognizes the scientific validity of that investigation may yet be at issue. For purposes of the current motion, the Court only concludes that the investigation record as a whole provided a reasonable basis to conclude the fire did not result from accident.

*ville,* 702 N.W.2d at 477 ("This court has held that an insurance company is not obligated to disregard the opinion of its own expert in favor of the insured's expert's opinion. Similarly, the insurer here was not obligated to disregard the opinion of the investigating officer simply because different conclusions could be drawn from the facts revealed by the officer's investigation." (internal citations and quotation marks omitted)).[6]

Next, in denying the Morses' claim pursuant to the policy's intentional acts clause, State Farm notes that both Kerry and Richard Sheeder testified that on April 27, 2008, they witnessed Linda and B.H. load the Morses' truck nearly full with boxes from the Guthrie Center house. Linda testified that on April 27, 2008, she only loaded the truck with three duffel bags containing clothing the Morses needed for their trip to Des Moines the following day. The Morses contend that State Farm should not be entitled to rely on the testimonies of Kerry and Richard Sheeder because they are not credible and because State Farm should give the Morses the benefit of the doubt in resolving conflicting testimony. However, an "insurer is not required to accept the evidence most favorable to the claimant and ignore contradictory evidence." *City of Madrid v. Blasnitz,* 742 N.W.2d 77, 83 (Iowa 2007) (citations omitted). Therefore, State Farm was not required to accept Linda's version of the events and ignore the Sheeders' testimonies. *See id.* (noting that an insurer is not required to believe the claimant).

Finally, State Farm submitted evidence that showed that the Morses may have

been suffering from financial strain, that the Guthrie Center house was in need of repairs, that the Morses were the last individuals in the house the morning of the fire and held the only known keys to the house, and that the Morses' previous home was also destroyed by fire while insured. Any of these facts, taken in isolation, are insufficient to make the exercise of the intentional acts clause fairly debatable. *See Niver v. Travelers Indem. Co. of Illinois,* 412 F.Supp.2d 966, 984 (N.D.Iowa 2006) ("Even under *Bellville,* . . ., the court (or jury) must determine whether the evidence upon which the insurer relied was sufficient to provide an 'objectively reasonable basis for denial of a claim,' not merely whether some scintilla of evidence 'existed' to support the insurer's denial." (quoting *Bellville,* 702 N.W.2d at 474)). However, the Court finds that these facts, in conjunction with IFIC's investigation, which concluded that the fire at the Guthrie Center house was incendiary, and the testimony of the Morses' neighbors, who stated that the Morses were moving items out of the Guthrie Center house the day before the fire, created a fairly debatable question as to the applicability of the intentional acts clause of the policy. *See Bellville,* 702 N.W.2d at 474 (holding that "if it is undisputed that evidence existed creating a genuine dispute . . ., a court can almost always decide that the claim was fairly debatable as a matter of law"). Therefore, a reasonable trier of fact could not determine that State Farm lacked a reasonable basis for asserting the intentional acts clause in denying the Morses' policy claim, and the Morses' bad faith

---

6. State Farm could similarly resolve the evidence in regard to the operation of the furnace. The Court notes the equipment was installed in November and had been in the home through the winter prior to the fire. Hartzler's conclusion that the furnace was not, and never had been, operational stands

in stark contrast to the Morses' willingness to state that the furnace was operational, and in fact had operated in a suspect fashion. If the furnace was not operational, it would seem the Morses would have known the fragile nature of their story.

claim must be dismissed as a matter of law.

### 2. Subjective Element

■ Assuming *arguendo* that State Farm lacked a reasonable basis for denying the Morses' claim, the Morses would next be required to show that State Farm "knew or should have known that the basis for denying its insured's claim was unreasonable." *Id.* "An insurer's negligent or sub-par investigation or evaluation of a claim is relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis." *Id.; see Reuter v. State Farm Mut. Auto. Ins. Co.,* 469 N.W.2d 250, 254 (Iowa 1991) ("The lack of proper investigation and evaluation is significant in proving the crucial element of a bad-faith tort, namely knowledge by the insurer of the lack of a debatable reason for denial.").

In their brief, the Morses argue that this subjective element is established because "a fair analysis of this investigation and its discoveries should have led to State Farm's realization that the Morses had a valid claim under their insurance policy." Pl.'s Br. 13. However, this assertion contemplates that a fair investigation could only lead to one result—in this case, that the Morses did not intentionally cause the Guthrie Center house to be destroyed—and that an investigation that concluded otherwise is evidence that State Farm knew or should have known that it did not have a reasonable basis for denying the Morses' claim. However, "[t]he fact that the insurer's position is ultimately found to lack merit" is not the issue before the Court. *Bellville,* 702 N.W.2d at 473. Indeed, aside from the fact that the Morses believe State Farm's investigation reached the wrong result, the Morses do not fault the procedure or scope of the investigation itself. As State Farm notes, the investigation included "three interviews with Linda Morse, two interviews with Robert Morse, interviews with several of the Morses' neighbors, investigations and analyses of the fire scene by a fire scene investigator and an electrical engineer, laboratory analysis of floor samples from the Morses' home, and an extensive investigation into the Morses' personal finances." Def.'s Br. 9. After State Farm provided Howe with the testimonies of the Morses, Howe reaffirmed his previous conclusion that "to a reasonable degree of fire science certainty, this fire originated in the bath/laundry room located to the north of the kitchen and dining area on the ground floor level of the home and was incendiary in nature." Def.'s App. 95. To the degree that the Morses argue that the investigation was somehow negligent or sub-par because IFIC was unable to conclude with complete certainty that the cause of the fire was incendiary, "in arson situations '[circumstantial evidence] is ordinarily the only evidence available.'" *AMCO Ins. Co. v. Stammer,* 411 N.W.2d 709, 713 (Iowa Ct. App.1987) (quoting *Koonts v. Farmers Mut. Ins. Ass'n,* 235 Iowa 87, 16 N.W.2d 20, 24 (1944) (noting that "[o]ne could scarcely be expected to set fire to his property in the presence of others")).

At the hearing, Plaintiffs also argued that State Farm knew or should have known that the investigation was inadequate because State Farm is cognizant of what constitutes a reasonable basis under the law. However, Plaintiffs did not explain how State Farm's alleged knowledge as to the prevailing legal standards in bad faith claims is different or superior to that of any other insurance company that faces a bad faith claim, or how that knowledge tends to show that State Farm knew or should have known that its investigation was inadequate.[7] The Court finds no basis

---

**7.** Plaintiffs also alleged that State Farm was      aware of the insufficiency of its investigation

on which to conclude that State Farm's purported knowledge of the legal standards for a bad faith claim in Iowa tends to show that State Farm knew or should have known that its investigation was inadequate.

The Morses have created no genuine issue of material fact that State Farm "knew or should have known that the basis for denying [the Morses'] claim was unreasonable," *Bellville*, 702 N.W.2d at 474, and therefore the Morses' bad faith claim must be dismissed as a matter of law.

### C. Punitive Damages

State Farm also moved for summary judgment with respect to the Morses' prayer for punitive damages. The Morses concede that "punitive damages are not appropriate in a contract only claim," and therefore "should the Court grant summary judgment on the bad faith claim State Farm is entitled to summary judgment on the punitive damages issue as well." Pl.'s Br. 13, 5. Because the Court has concluded as a matter of law that State Farm did not act in bad faith in denying the Morses' insurance claim, leaving only the Morses' breach of contract claim, the Morses' claim for punitive damages cannot be maintained and must be dismissed. *See Seastrom*, 601 N.W.2d at 347 (holding that Iowa courts "will only uphold an award of punitive damages for breach of contract when the breach (1) constitutes an intentional tort, and (2) is committed maliciously, in a manner that meets the standards of Iowa code section 668A.1"); *Magnusson Agency v. Pub. Entity Nat'l Company-Midwest d/b/a PENCO*, 560 N.W.2d 20, 29 (Iowa 1997) ("Generally, a breach of con-

tract, even if intentional, is insufficient to support a punitive damage award.").

### III. CONCLUSION

State Farm's Motion for Partial Summary Judgment (Clerk's No. 11) must be **granted. Count II** of the Complaint is **dismissed.**

**IT IS SO ORDERED.**

because the investigation was contentious and because the Morses were treated poorly throughout the process. However, Plaintiffs fail to support this allegation with any evidence in the record. In fact, the record

shows that State Farm advanced $2,000 cash to the Morses at the beginning of the investigation and provided the Morses with hotel accommodations at a cost of $12,061.28 to State Farm.