**IN THE COURT OF APPEALS OF IOWA**

No. 22-1801
Filed November 8, 2023

**IN THE MATTER OF THE ESTATE OF JOHN EUGENE JOHNSTON, Deceased.**

**PEGGY JOHNSTON,**
 Appellant.
_____

Appeal from the Iowa District Court for Wapello County, Greg Milani, Judge.


Peggy Johnston appeals an adverse grant of a directed verdict on her claim against her deceased husband's estate. **REVERSED AND REMANDED.**


Richard J. Gaumer of Gaumer, Emanuel, Carpenter & Goldsmith, P.C., Ottumwa, for appellant.

Randall C. Stravers of Stravers Law Firm, Oskaloosa, and Greg Life, Oskaloosa, for appellees.


Heard by Tabor, P.J., Badding, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BADDING, Judge.**

After John Johnston died in March 2018, his wife, Peggy Johnston, filed a claim against his estate for "[o]ne-half of the joint accounts held by" them. The claim alleged funds from the joint accounts were transferred to John's daughter from a prior marriage—Rebecca Askeland. At the close of Peggy's evidence at the hearing on the claim, Rebecca and the estate moved for a directed verdict. The court granted the motion, analyzing Peggy's claim under the elements for the tort of conversion. Peggy appeals, claiming the court "applied the incorrect law to the facts presented." We agree. The court's directed verdict for Rebecca and the estate is reversed, and we remand for completion of the hearing on the claim.

## I.      Background Facts and Proceedings

John and Peggy married in 1980. Rebecca is John's daughter from a prior marriage. John and Peggy held joint checking and savings accounts throughout their marriage. They both used the accounts and deposited money into them, though most of the deposits were from John's retirement benefits and investments. John and Peggy would normally deposit their money into the savings account, which was interest-bearing, and then make transfers to their checking account to cover "household bills, groceries, any other things that came up." Peggy agreed that neither she nor John made "an attempt to distinguish in the accounts what was [hers] and what was his"—"it was all kind of bunched together as a joint account like married people often do."

This appeal involves two certificates of deposit purchased by John before his death with funds that Peggy contends came from, or went through, their joint accounts. Peggy testified that she did not know about the transactions involving

the certificates of deposit until after John's death. She explained that she and John would discuss some financial decisions, like building a house, for example. But, generally, if John "wanted to do something, you know money-wise, he would go and shuffle money and withdraw money and not say anything about it." Peggy testified this behavior increased as the marriage went on, and she didn't see the bank statements later in the marriage because John would get the mail.

The first certificate—in the amount of $40,000.00—was issued on June 26, 2015, to John and Rebecca jointly with survivorship. Peggy testified the money for that certificate came from her joint savings account with John, although a letter from the bank that issued the certificate stated it "was purchased in 2015 after closing a CD with John as the only owner." A deposit slip, admitted into evidence as Exhibit 8, was dated the same day as the new certificate of deposit was issued. It listed a closed certificate of deposit in the amount of $45,736.05 in the deposit column and a "New CD" of $40,000 under the "less cash" column. The remaining $5736.05 went into the joint savings account shared by John and Peggy. At the hearing, the parties seemed to agree that all the money from the closed certificate of deposit went through the couple's savings account before the new $40,000 certificate of deposit was purchased.[1] Once that certificate matured, John

---

[1] On redirect examination by her attorney, Peggy testified: "Q. Ms. Johnston, that $40,000 if you look back at Exhibit No. 8, the source of that CD, that $40,000 that was just in John's name, that money came from your joint account as shown on Exhibit 8? A. Yes." Later, when Peggy's attorney asked her, "Was there a plan to take $40,000 from the joint account and open John's own account?" Rebecca's attorney objected, arguing: "It's a misstatement of the record. The money came from this other CD. It didn't come from the joint account. *It went through it*, but the money came from this other CD." (Emphasis added.) Peggy later agreed "the $40,000 . . . went through the joint account."

deposited the proceeds of $40,331.82 into a new checking account that he opened in his name only on January 3, 2017.

The second certificate—in the amount of $70,000.00—issued on September 6, 2016, to John and Rebecca jointly with survivorship. A bank statement from the savings account shared by John and Peggy shows a withdrawal of $70,000.00 from the account on September 7, 2016. Peggy agreed the $70,000.00 that was used for this certificate came from the sale of real property owned solely by John, but the evidence shows that sale occurred roughly five years earlier.[2] This certificate of deposit was to mature in March 2017 at a value of $70,052.07. That exact sum was deposited into John's separate checking account on March 9.

John executed his last will and testament in December 2017. His will left all his property to his three daughters, including Rebecca, either directly or through a testamentary trust. John died on March 11, 2018. According to the joint account report issued by the bank, the combined value of the joint checking and savings accounts shared by John and Peggy was $722.15 when John died, with Peggy as the surviving owner. As for the checking account that John opened with the proceeds of the first certificate of deposit, the bank's report form listed Rebecca as the surviving owner and noted the value at death was $79,761.12.

---

[2] The parties do not dispute that the $70,000.00 in proceeds from the 2011 sale of real property went into the joint accounts. However, a June 2015 bank statement for the savings account indicates that not all the funds from that sale were left in the account since its balance was in the $20,000.00 range. But by the end of April 2016, the savings account balance was at $228,565.48.

Rebecca petitioned to probate John's will shortly after his death. Peggy filed a notice of her election to receive her share of the estate as John's surviving spouse. In time, Peggy filed a claim against the estate for $94,500.00 attributable to "[o]ne-half of the joint accounts held by John Johnston and Peggy Johnston which were transferred to Rebecca Askeland," as reflected by "a certificate of deposit of $70,000, a certificate of deposit of $40,000 and a joint checking account of $79,000." After Peggy requested a hearing, *see* Iowa Code § 633.443 (2018), the estate denied the claim. An attorney for Rebecca entered an appearance before the hearing on the claim.

In a prehearing brief, Peggy argued that she was entitled to one-half of the money John used from joint accounts to buy the certificates of deposit, which would be $55,000.00.[3] She likened her claim to one discussed by this court in *Kettler v. Security National Bank*, 805 N.W.2d 817, 823 (Iowa Ct. App. 2011), which held that "[i]n a case where a joint tenant makes a valid withdrawal of more than his proportional share," the remedy is "a suit between the joint tenants to recover the funds taken in excess of the withdrawing joint tenant's proportional share." Peggy concluded her brief by "seeking recover[y] for John's removal of excess funds from the joint tenant account, plus interest from the date of conversion."

At the hearing, Peggy's evidence was limited to her testimony and stipulated exhibits from the parties. Once Peggy rested, Rebecca and the estate moved for

---

[3] Peggy also asked for one-half of the funds John used to buy a new truck before his death. That issue is not raised in this appeal. And she abandoned her claim to the $79,000 in the checking account John had at his death that was payable to Rebecca.

a directed verdict, arguing that "the testimony is clear there was no attempt by the parties to keep track of the monies in those accounts as my account, your account." They continued by challenging Peggy's contention that the funds used to buy the certificates of deposit came from her and John's joint accounts:

> [W]e have a source of funds for the $40,000 as a prior CD in the name of John only. That's in a letter from the bank. It's undisputed. That $40,000 did not come from the money in a joint account. It came through. The money was transferred through because it had to go through the account, but it didn't originate there. It was from a prior CD and that's what the record shows.
> Same thing with the $70,000. The claimant's own testimony is that $70,000 was from the proceeds from the sale in real estate. Real estate just in the name of the decedent, John Johnson.

In response, Peggy contended that under *Kettler*,

> a cotenant may not withdraw from the account in excess of his interest. If he has done so, he's liable to the other joint [cotenant] for the excess so withdrawn. It's a joint account. There is no document that has been produced by anyone to show that this was other than an equal 50-50 division account.

> Ruling from the bench, the court granted the motion for directed verdict:

> The Court finds that for conversion there has to be ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant. There was no evidence of that in this case.
> Also has to show dominion or control over titles by the defendant inconsistent with or derogation of the plaintiff's possessory rights. There's limited evidence of that and limited evidence of damages. There's no evidence to prove this was anything other than estate planning done by the decedent. And there's also great evidence that th[e] account transfers were made and done with the knowledge of the plaintiff and with her consent.
> When you consider the sources of the funds, particularly all the income apparently to the account came from income, retirement income, and earnings of the decedent. And therefore, the Court rules case dismissed.[4]

---

[4] The supreme court has stated that when actions are tried to the court without a jury, the motion should be designated as a motion to dismiss instead of a motion for a directed verdict, although "[t]he misnomer is not material . . . because a motion

The court then entered an order dismissing the claim "[f]or the reasons set forth on the record." Peggy appeals.

## II.     Standard of Review

Review of the district court's grant of a motion for directed verdict is for legal error. *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 20 (Iowa 2021).

> We review the evidence in the light most favorable to the party against whom the motion was sustained. The movant is considered to have admitted the truth of all evidence offered by the adversary and every favorable inference that fairly and reasonably may be deduced from it. An order sustaining such a motion rests on legal grounds and does not find facts. Sustention is warranted only when the evidence is insufficient as a matter of law to permit the adverse party to recover.

*Rodgers v. Baughman*, 342 N.W.2d 801, 803–04 (Iowa 1983) (internal citations omitted).

## III.     Analysis

We start and end with Peggy's claim that the district court "applied the incorrect law to the facts." More specifically, she argues the court "analyzed [her] claims as a conversion case in tort and not a contract case" raising "a claim based upon a loss of a proportional interest of the bank accounts."

As laid out above, the district court did find Peggy failed to establish that her ownership or other possessory right over the funds was greater than the defendants' rights in the same. And Peggy is correct that this is an element of a conversion claim sounding in tort. *See Larew v. Hope Law Firm, P.L.C.*, 977 N.W.2d 47, 60 (Iowa 2022) (noting conversion plaintiff must prove, among other

---

to dismiss during trial is equivalent to a motion for directed verdict." *Iowa Coal Mining Co., Inc. v. Monroe Cnty.*, 555 N.W.2d 418, 438 (Iowa 1996).

things, "that his ownership or other possessory right in certain property exceeded the defendants' rights in the property"). But that is not the type of claim Peggy brought.

Instead, Peggy sought recovery of her proportional interest in a joint bank account. That type of conversion claim—which Peggy addressed in her prehearing brief—is different in that it is controlled by contract law and does not require the establishment of a greater ownership or possessory right. As the court in *Kettler* explained, "Joint tenancy property is property held by two or more parties jointly, *with equal rights to share in the enjoyment of the whole property during their lives*, and a right of survivorship which allows the surviving party to enjoy the entire estate." 805 N.W.2d at 821 (emphasis added) (citation omitted). The parties' shares of "a joint bank account are determined by the rules of contract law, and the intent of the parties . . . is controlling." *Anderson v. Iowa Dep't of Human Servs.*, 368 N.W.2d 104, 109 (Iowa 1985). The starting point is the presumption that each joint tenant owns an equal share in the joint account, although this presumption is rebuttable. *Id.* When the presumption of equal shares prevails and one joint tenant makes a valid withdrawal of more than his or her proportional share, then he or she is liable to the other joint tenant for the excess.[5] *See Kettler*,

---

[5] We note this case is not really about severance or termination of the joint tenancy like *Kettler* was. A withdrawal of funds can support termination or severance of a joint tenancy. *See Kettler*, 805 N.W.2d at 823. But severance or termination only affects the survivorship interest, not the proportional share. *See id.* at 823, 825. There is no dispute that Peggy has a survivorship interest in the funds remaining in the accounts, so the joint tenancy in the accounts themselves was not terminated. While withdrawal of funds would terminate or sever joint tenancy as to the withdrawn funds, the other joint tenant may still recover those funds based on their proportional interest. *See id.* at 825.

805 N.W.2d at 823, 825; *see also Anderson*, 368 N.W.2d at 110; *In re Est. of Klingaman*, No. 10-0095, 2010 WL 3894264, at *3 (Iowa Ct. App. Oct. 6, 2010) ("Withdrawal in excess of one's real interest may create a liability to the other joint tenant.").

The district court missed the mark by requiring Peggy to prove a greater ownership or possessory right to the funds in the joint account, though we can see why it did so given the use of the term "conversion" by Peggy and the court in *Kettler*. *See also In re Est. of Nickles*, No. 15-1317, 2016 WL 4384687, at *2 (Iowa Ct. App. Aug. 17, 2016) (describing the claim in *Kettler* as one for conversion). And, as Peggy contends on appeal, estate planning was not a valid reason for the court to grant the motion. Under *Kettler*, even though John had a right to withdraw the funds and put them under his control for estate-planning purposes, "he did so at the risk of [Peggy] claiming her proportionate share." 805 N.W.2d at 825.

So Peggy is correct that the district court applied an improper legal standard and resulting burden. From there, Peggy argues that she prevails under the correct legal framework, submitting that "[i]n this case there is no evidence that ownership was other than equal." In other words, Peggy contends the evidence conclusively established that the presumption of equal ownership was not rebutted, so we should enter judgment in her favor. On the flip side, Rebecca and the estate contend the presumption of equal ownership "was clearly overcome" because (1) neither John nor Peggy "attempt[ed] to distinguish what funds in the accounts were hers and what funds in the account[s] were his" and (2) the disputed funds were proceeds from the liquidation of other assets owned solely by John.

On the first point, the critical intent question in examining whether the presumption was overcome is "the intent of the parties in creating the joint tenancy account[s]," not their use of the accounts over the years.[6] *Anderson*, 368 N.W.2d at 110; *accord Grout v. Sickels*, 985 N.W.2d 144, 152 (Iowa 2023) (discussing *Frederick v. Shorman*, 147 N.W.2d 478, 481–83 (Iowa 1966) and explaining the relevant intent to overcome the presumption of equal shares is the intent existing at the time the joint tenancy was created); *In re Est. of Kirk*, 591 N.W.2d 630, 634 (Iowa 1999) ("The proportional interest is the joint tenant's interest which comes from the creation of the joint tenancy . . . ."); 48A C.J.S. *Joint Tenancy* § 22 (Aug. 2023 update) ("[T]he rights of the joint tenants are fixed and vested at the time of the creation of the joint tenancy.").[7] There was no evidence presented on that question, meaning at the point when the directed verdict was granted, the presumption of equal shares prevailed. *See Anderson*, 368 N.W.2d at 109 (noting the burden to rebut the presumption is on the party who contends the joint account was not equally owned); *accord Frederick*, 147 N.W.2d at 483–84; Iowa R. App.

---

[6] Assuming the parties' use of the accounts was relevant to the intent question, if both had free rein over the accounts as Rebecca and the estate assert, then there would not have been an agreement contrary to equal shares and the presumption would prevail.

[7] One unpublished decision does say that "[t]he co-owners' intent may be inferred from their purpose for creating the joint account as well as the pattern of deposits and withdrawals," which suggests that the parties' use of the account can shed light on the intent of the parties in creating it. *Nickles*, 2016 WL 4384687, at *2. In support of that statement, *Nickels* cites, among other cases, *Schroeder v. Todd*, 86 N.W.2d 101, 104 (Iowa 1957), which explained unequal contributions, i.e. deposits, to a "tenancy in common, overcomes presumption that they take equal shares, and raises presumption they intended to share in proportion to amounts contributed by each." The supreme court has since said *Schroeder* does not apply to property acquired as a joint tenancy with rights of survivorship. *Grout*, 985 N.W.2d at 152–53.

P. 6.904(3)(e) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established.").

The evidence on the second point was conflicting, at least as to the $40,000 used to buy the certificate of deposit in June 2015. Peggy testified the $40,000 came from the joint savings account, though when confronted with bank records that did not support that assertion, she clarified the $40,000 went "through the joint account." Rebecca and the estate seemed to agree, arguing "[t]hat $40,000 did not come from the money in a joint account. It came through. The money was transferred through because it had to go through the account, but it didn't originate there." *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005) ("[T]he trial court was required to view the evidence in the light most favorable to the plaintiff, 'regardless of whether it was contradicted.'" (citation omitted)). They likewise agreed the $70,000 withdrawal that was made to buy the second certificate of deposit in September 2016 came from the joint savings account. *See Anderson*, 368 N.W.2d at 109 (discussing New York law with approval and observing a New York court reversed a conclusion that the presumption of equal shares was rebutted when there was no evidence that depositor "did not intend to confer a beneficial interest in the account by making a gift to her nephew of one-half of the sums on deposit" (quoting *Coughlin v. Comm'r of Soc. Servs.*, 75 A.D.2d 895, 896 (N.Y. App. Div. 1980))); *see also Kettler*, 805 N.W.2d at 824 n.7 (observing that, under New York law, "[w]hen a joint tenant

deposits funds into the account, one-half of the funds are presumed to be a gift to the other joint tenant").[8]

The district court did not address this evidence or its implications, focusing instead on the elements for the tort of conversion. As our supreme court explained in *Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017),

> If we find an incorrect legal standard was applied, we remand for new findings and application of the correct standard. Although an omitted ruling on an issue of law may sometimes be cured by this court's ruling on that issue, this is not possible with respect to an omitted finding of fact in a law-tried case.

(Cleaned up.) Unless we determine there is insufficient evidence as a matter of law, we must remand to the district court. *Id.* at 773; *accord Rodgers*, 342 N.W.2d at 804.

Upon viewing the evidence in the light most favorable to Peggy, assuming its truth and every favorable inference that can be deduced from it, we cannot say the evidence was insufficient as a matter of law to sustain her claim. *See Rodgers*, 342 N.W.2d at 803; *see also Bellville*, 702 N.W.2d at 473. We accordingly reverse the court's directed verdict and remand for completion of the hearing on the claim and adjudication on the merits, applying the correct legal framework as laid out above. *See Rodgers*, 342 N.W.2d at 807; *accord Double H Livestock, Inc. v. Gathman*, No. 02-0191, 2003 WL 289270, at *3 (Iowa Ct. App. Feb. 12, 2003) (concluding the district court "committed error in granting defendant's motion for directed verdict" where the evidence was conflicting and

---

[8] As noted, *Anderson* discussed New York law with approval. *Kettler* did state that "the 'New York rule' is not consistent with Iowa law," but that statement appears to be limited to severance of joint tenancies and does not apply to the rule about the presumption of equal shares. *See* 805 N.W.2d at 824.

remanding for adjudication of this case on the merits); *Terukina v. Gazelle Vill., Inc.*, No. 05-1109, 2006 WL 782749, at *3 (Iowa Ct. App. Mar. 29, 2006).

**REVERSED AND REMANDED.**